**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**RICARDO D., Defendant–Appellant.**

**No. 89–10319.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 16, 1990.

Decided Aug. 24, 1990.

**338**

Jacqueline Marshall, Ralls & Bruner, P.C., Tucson, Ariz., for defendant-appellant.

Joelyn D. Marlowe and Bert Vargas, Asst. U.S. Attys., Tucson, Ariz., for plaintiff-appellee.

Before TANG, NORRIS and FERNANDEZ, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

Ricardo D. appeals his conviction for juvenile delinquency in violation of 18 U.S.C. §§ 5031–37, based on possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii). Appellant argues that the district court erred in denying his motions to suppress evidence and statements. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse.

## I

The relevant facts are not in dispute. On the evening of May 17, 1989, United States Border Patrol Agent Philip Johnson positioned himself to survey a ranch located on Highway 92 south of Sierra Vista, Arizona. Based on his prior tracking of footprints from Mexico leading to the ranch, Agent Johnson suspected possible drug activity. At approximately 9:30 p.m., he saw five or six men cross the highway and disappear near the entrance walls to the ranch. About ten minutes later, a van briefly entered the ranch. Agent Johnson contacted two other agents, Garcia and Emery, to assist him in stopping the van.

With the agents in pursuit, the van stopped suddenly on the side of the highway. Agent Johnson testified that he saw "a young, thin man, not too tall" run from the van and jump a nearby right-of-way fence. Because the agents wanted to secure the van and its driver, they did not pursue the man. The van was filled with bundles wrapped in black plastic. Agent Johnson testified that he could smell marijuana.

Border Patrol and DEA agents briefed Deputy Sheriff Scott Bork of the Sierra Vista substation about the van, its contents, and the escape of a passenger. At about 11:15 p.m., the substation dispatcher received a call regarding a suspicious person at a general store near where the van had been stopped. Deputies responded to the call, but discovered that the suspect was a person known in the community and not involved in the van incident. As the deputies were leaving the store, a truck drove up and the driver asked the deputies whether they were looking for "a young Mexican kid." The driver stated that he had just dropped off a young Mexican male at a pay phone in Nicksville. The driver had picked up the male about one-half mile from where the van had been stopped.

Deputies Bork and Daniels, in two patrol cars, drove to Nicksville. Daniels had on his spotlight and Bork was using his high beams. As Bork drove up, saw a young man, Ricardo D., crouched behind a tree, approximately twenty feet from a pay phone and an adjacent restaurant. Ricardo made no attempt to leave when the patrol cars approached. Deputy Bork faced his car to illuminate Ricardo, walked up to him, patted him down, and directed him over to the patrol car. As they were walking to the car, Bork took hold of Ricardo by the arm and said "I don't want you running anymore." Ricardo replied that he would not run. Bork then had Ricardo sit in the back seat of the patrol car with the door left open, and proceeded to question him.

Bork asked Ricardo what he was doing in the area. Ricardo replied that his sister had dropped him off and that he had been visiting a friend. Upon further questioning, Ricardo told Bork that he attended a certain school in Tuscon and that the school was not currently in session. Deputy Bork responded that he knew school was in session in Tuscon. At this point, Ricardo admitted that he was not from Tuscon. Because he felt Ricardo was being evasive and lying, Deputy Bork notified the Border Patrol so that they could interview Ricardo. Bork also told Ricardo that if he kept lying, Bork could arrest him for providing false information.

Border Patrol Agent Emery arrived at the scene about five minutes later. He asked Ricardo what he was doing in the area, and Ricardo replied that he had gotten lost in a field near the restaurant. He also said that he had stopped at a nearby house and had asked a man for a ride into town. On being asked how he came to be lost out in the fields, Ricardo replied that he was "just there." Agent Emery then asked Ricardo if he knew about a van that had been stopped on the highway. Ricardo first denied any knowledge of the van, but when asked again, Ricardo admitted that he was the person who had fled from the scene. Agent Emery then asked Deputy Bork to read Ricardo his *Miranda* rights.

Ricardo was then taken to the Sierra Vista substation. After stating that he had been told his *Miranda* rights and that he understood them, Ricardo agreed to provide the agents with a statement. Before the interview began, Deputy Bork telephoned Ricardo's sister and obtained her consent to the interview. Ricardo was within earshot of the telephone conversation.

The interview took place in a room about eight feet by six feet and lasted for approximately one hour. Four other officers were present when Agent Garcia conducted the interview. Agent Garcia testified that the atmosphere was relaxed, that the agents offered Ricardo a soda, and that Ricardo was generally relaxed and confident during the questioning.

The district court denied Ricardo's motions to suppress evidence and statements. After a bench trial, the court found Ricardo guilty of juvenile delinquency based on possession with intent to distribute marijuana.

## II

In this case we once again confront the issue of when an investigatory stop exceeds permissible limits and becomes a de facto arrest. Appellant argues that he was arrested without probable cause, and that his statements should therefore be suppressed as the fruits of an unlawful arrest. Implicit in this argument is the contention that Ricardo was effectively under arrest when he was questioned in the patrol car, prior to his initial admission to Agent Emery that he was the person who had fled from the van. The government contends that the officers had reasonable suspicion to detain Ricardo, that the initial detention was nothing more than a *Terry* stop, and that reasonable suspicion ripened into probable cause upon Ricardo's admission to Agent Emery during field questioning.

### A. *Arrest*

We review de novo the question whether the seizure of Ricardo prior to his formal arrest[1] exceeded the bounds of an investigatory stop. *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988). At the hearing on the suppression motions, the district court found that probable cause for the arrest existed, without any explicit finding of when the arrest occurred. Given that the government essentially concedes that there was no probable cause to arrest Ricardo prior to his first admission, the district court implicitly found that the field detention was nothing more than a *Terry* stop.

The Supreme Court itself has recognized that distinguishing a *Terry* investigative

---

1. For the purposes of our analysis, we assume that the "formal" arrest occurred at or subsequent to the time when Ricardo D. was given his *Miranda* warnings and transported to the stationhouse for questioning. ·

stop from a de facto arrest "may in some instances create difficult line-drawing problems." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). As noted by the Court in the seminal case of *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), each case must be decided on its own facts. "Whether an arrest has occurred depends on all the surrounding circumstances, including the extent to which liberty of movement is curtailed and the type of force or authority employed." *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987). In reviewing the facts and circumstances of each case, we must be mindful of the narrow scope of the *Terry* exception—an exception based on a brief, street encounter between police and a suspect. To do otherwise would be to risk allowing the " 'exception' ... to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway v. New York*, 442 U.S. 200, 213, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979); *see Florida v. Royer*, 460 U.S. 491, 510, 103 S.Ct. 1319, 1331, 75 L.Ed.2d 229 (1983) (plurality opinion) (Brennan, J., concurring).

■ Under the totality of the circumstances, we conclude that the detention of Ricardo during field questioning by officers Bork and Emery amounted to a de facto arrest. With the high beams of a police car shining in his face, 16–year–old Ricardo was patted down, gripped by the arm, told he was not to run anymore, and directed to the back of one of two patrol cars present at the scene. In *United States v. Baron*, 860 F.2d 911, 916 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989), we found coerciveness to be the critical factor in determining that an arrest had occurred. Similarly, in this case we conclude that taking hold of and isolating an unarmed, compliant juvenile in the back of a police car was unnecessarily coercive, and thus transformed the investigatory stop into an arrest.

■ Our conclusion is consistent with decisional guidelines concerning the scope of a permissible *Terry* stop. In general, the investigative methods used should be the least intrusive means reasonably available. *Florida v. Royer*, 460 U.S. at 500, 103 S.Ct. at 1325. Although the use of some force does not automatically transform an investigatory detention into an arrest, any overt show of force or authority should be justified under the circumstances. *See, e.g.*, *United States v. Holtzman*, 871 F.2d 1496, 1502 (9th Cir.1989) (restraints justified by belief suspect was attempting to flee); *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (given officer's knowledge of suspect's history of violence, show of force justified by fear for personal safety). Similarly, as suggested by the Court in *Florida v. Royer*, 460 U.S. at 504–05, 103 S.Ct. at 1328, the police may move a suspect from the location of the initial stop without converting the stop to an arrest when it is necessary for safety or security reasons. *Baron*, 860 F.2d at 915.

We find no such justifications for taking hold of Ricardo, telling him not to run anymore, and seating him in the back of the patrol car for questioning. In *Holtzman*, we held that manual restraints and a show of authority were justified by the officer's belief that Holtzman was attempting to flee. 871 F.2d at 1502; *see also United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982) (handcuffs permissible when defendant kept pacing and looking as if he was about to run), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983). In this case, however, Officer Bork testified that Ricardo made no attempt to flee when approached. Moreover, we discern no reasons of safety or security for moving Ricardo to the patrol car. The officers had no reason to believe Ricardo was dangerous. Furthermore, the location of the "stop" was rural and there were no other people in the area when the officers pulled up. *Compare Eberle v. City of Anaheim*, 901 F.2d 814, 819 (9th Cir.1990) (no arrest when officers took suspect to security office at football stadium due to safety concerns caused by large, unruly crowd).

■ Although, as stated by the Fourth Circuit, the back of a patrol car "is not an ideal location for the purposes of an investigatory detention," *United States v. Manbeck,* 744 F.2d 360, 377 (4th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985), we recognize that the element of isolation from the public view (and concomitant coerciveness) in such a case is somewhat weaker than when a suspect is taken to a private room for interrogation. *See Baron,* 860 F.2d at 916 (noting that the suspect would probably have felt less threatened sitting in a patrol car in public than shut in a darkened bedroom). We have stated that there is no per se rule that detention in a patrol car constitutes an arrest, *Parr,* 843 F.2d at 1230, yet, "[t]here is clearly no mechanical checklist to distinguish between *Terry* stops and formal arrest or the equivalent of arrest," *id.* at 1231. Thus, we held that when a defendant was placed in the back of a patrol car for twenty minutes, questioned, and never informed that he was free to leave, the detention was equivalent to an arrest. *United States v. Chamberlin,* 644 F.2d 1262, 1267 (9th Cir.1980), *cert. denied,* 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

■ Decisions in this and other circuits support the proposition that detention in a patrol car exceeds permissible *Terry* limits absent some reasonable justification or when the detention is something other than a brief procedure employed in a routine traffic stop. In *Parr,* we held that no arrest occurred when, after a routine vehicle stop, the officer placed Parr in the patrol car for a few minutes while the officer spoke to Parr's companion and conducted a search of Parr's vehicle. 843 F.2d at 1231. In that case, however, as the officer was stopping Parr, he observed Parr and his companion "bend toward the floorboard and 'make furtive movements.'" *Id.* at 1229. Although we did not explicitly consider this circumstance, it would appear that reasons of safety and security thus justified moving Parr to the police car. Furthermore, we noted the reasoning of the Seventh Circuit that "'sitting in a patrol car for several minutes was

merely a normal part of traffic police procedure for identifying delinquent drivers' and did not constitute custodial arrest." *Id.* at 1230 (quoting *United States v. Rodriquez,* 831 F.2d 162, 166 (7th Cir.1987), *cert. denied,* 485 U.S. 965, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988)). Our decision thus rested in part on a distinction between "routine traffic arrests" and "custodial arrests" for the purpose of limiting the scope of an incidental search. *See id.*

Other circuits addressing the patrol car issue have relied on similar justifications for upholding the detention as a mere investigatory stop. *See, e.g., Manbeck,* 744 F.2d 377–78 (defendant would have had possible access to weapons and a means of escape if allowed to remain in his own truck, and due to inclement weather, placement in patrol car was only feasible alternative); *United States v. Lego,* 855 F.2d 542, 545 (8th Cir.1988) (because suspect already found to have a weapon, safety concerns made it proper for lone officer to have suspect sit in patrol car while officer ran a check for outstanding warrants).

No comparable circumstances serve to explain or justify Ricardo's patrol car detention. As discussed previously, the officers had no reason to fear for their own safety or the safety of others. Nor was this a traffic stop with any attendant need to remove the suspect from his own vehicle and place him in a safe location. Finally, Officer Bork did not, and in fact could not, conduct a warrants check on Ricardo. *See* Transcript of Proceedings at 62, CR 89–184–TUC–WDB (June 14, 1989) (testimony of Officer Bork that "[t]he only time a juvenile can be entered is if he were a runaway"). In sum, there was no reason to move Ricardo from a public place to the patrol car for questioning.

Although the movement of Ricardo to the patrol car is a significant factor in our analysis, we reiterate that each case is decided under the totality of the particular circumstances. For example, in conjunction with the place of detention, in *Baron* we considered the disparity in power stemming from the fact that Baron was a female detained by three male officers. *Bar-*

*on,* 860 F.2d at 916. Here, we take into account that a juvenile was confronted by several officers.[2] To a limited extent, we also consider Officer Bork's threat of arrest for providing false information as adding to the coercive atmosphere of the detention. Thus, all the circumstances, including the facts that the suspect was sixteen, taken by the arm, told not to run, and placed in the back of the police car, indicate a degree of coercion unacceptable as part of a *Terry* stop, and unsupportable on anything less than probable cause. We therefore hold that the officers effectively arrested Ricardo when they detained him in the patrol car for questioning.

## B. *Probable Cause*

■ Having determined that Ricardo was in fact under arrest during the field questioning by Officers Bork and Emery, we next briefly address the question of probable cause. Our review is de novo. *United States v. Delgadillo-Velasquez,* 856 F.2d 1292, 1295 (9th Cir.1988). The officers had probable cause to arrest Ricardo if, at the time of the arrest, they had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that Ricardo had committed or was committing a crime. *Holtzman,* 871 F.2d at 1503.

■ As the government apparently concedes, probable cause to arrest Ricardo did not exist prior to Ricardo's initial admission to Agent Emery that Ricardo was the one who fled from the van.[3] At the time of Ricardo's arrest, the only knowledge possessed by the officers was that a "young, thin man, not too tall" had run from a van containing marijuana, and that a truck driver had picked up a "young, Mexican male" approximately one-half mile from where the van had been stopped, and had given him a ride to a pay phone in Nicksville. In

a location only thirty miles north of the Mexican border, it can hardly be said that the presence of a young, Mexican male is highly unusual. Furthermore, although Officer Bork found Ricardo "crouching" behind a tree, Ricardo made no attempt to flee when approached by the officer. In sum, while there may have been reasonable suspicion to justify a *Terry* stop, there was insufficient information to lead a reasonable person to believe that Ricardo had committed a criminal offense. Ricardo's arrest was, thus, illegal.

## C. *Suppression of Evidence*

■ The ultimate question is whether Ricardo's statements should be suppressed. Our analysis here is twofold: We first consider those statements made during Ricardo's field detention, and, next, Ricardo's stationhouse confession.

It is well established that the fourth amendment exclusionary rule applies to statements and evidence obtained following an illegal arrest. *Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–18, 9 L.Ed.2d 441 (1963). As stated by the Court in *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416), "*Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" The Court then identified several factors relevant to determining whether a confession is obtained by exploitation of an illegal arrest. These include: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the police misconduct. *Id.* 422 U.S. at 603–04, 95 S.Ct. at 2261–62.

---

**2.** Over a decade ago, the Supreme Court suggested that a suspect's age may be considered in determining whether a seizure constitutes an arrest. *Dunaway,* 442 U.S. at 215 & n. 17, 99 S.Ct. at 2258 & n. 17.

**3.** *See* Brief of Appellee at 13 ("It was at this point that Agent Emery had sufficient probable

cause to arrest the defendant."). Because we have held that Ricardo was under arrest when Agent Emery arrived to question him, Ricardo's admission cannot be relied on to establish probable cause. *See Delgadillo-Velasquez,* 856 F.2d at 1298 (initial seizure cannot be justified by information obtained as a result of that seizure).

■ Our discussion of Ricardo's responses to field questioning is cursory. Ricardo made these statements while subject to de facto arrest and before the officers provided *Miranda* warnings; thus, under the prophylactic rule of *Miranda v. Arizona,* the statements must be suppressed. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Because we do not get beyond the fifth amendment voluntariness requirement, we need not conduct any further fourth amendment analysis under *Wong Sun* or *Brown. See Chamberlin,* 644 F.2d at 1268; *Dunaway,* 442 U.S. at 217, 99 S.Ct. at 2259.[4]

■ We analyze Ricardo's later confession at the stationhouse in light of the principles articulated in *Brown.* Although Ricardo made this confession after receiving *Miranda* warnings, "alone and *per se,*" *Miranda* warnings are not necessarily sufficient to break the causal connection between an illegal arrest and subsequent confession. *Brown,* 422 U.S. at 603, 95 S.Ct. at 2261. In addition, the government contends, and the district court so found, that Ricardo's confession was "voluntary." We assume, *arguendo,* that Ricardo voluntarily waived his right to counsel and that the confession was not coerced within the meaning of the fifth amendment. Yet, as indicated above, the voluntariness of a statement is merely a threshold requirement for fourth amendment analysis. *Dunaway,* 442 U.S. at 217, 99 S.Ct. at 2259.

Applying the three factors set forth in *Brown,* we conclude that Ricardo's confession was not sufficiently attenuated to purge the taint of his illegal arrest. First, Ricardo's confession followed on the heels of his illegal arrest, separated only by a brief ride to the sheriff's station, his placement in the interrogation room and a short phone call by Officer Bork to Ricardo's sister. Second, the drive to the station was clearly not an intervening event of any significance; although Ricardo was not questioned during the ride, he remained subject to police presence. *Cf. United States v. Johnson,* 626 F.2d 753, 759 n. 1 (9th Cir.1980) (holding that even though defendant drove himself to the station, he was not free from police influence for any significant time as in *Wong Sun* ), *aff'd on other grounds,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Nor do we view the telephone call to Ricardo's sister as breaking the causal chain. There is nothing to suggest that Ricardo's knowledge that his sister consented to the questioning would in any way make his subsequent confession an independent act of free will. Finally, in considering the third factor, we recognize that "the purpose and flagrancy of the official misconduct" here is of a lesser degree than in other cases. Nevertheless, we have held that when the flagrancy of the violation is not "particularly important," a close causal connection established by the first two factors requires the conclusion that the statements were obtained by exploitation of the arrest. *Id.* at 759; *see also* 4 W. LaFave, *Search and Seizure* § 11.4(b) at 397 (2d ed. 1987) ("it does not follow ... that an otherwise inadmissible confession deserves to be admitted into evidence simply because there had been no showing of a flagrant and purposeful Fourth Amendment violation"). Thus, we hold that the district court erred in admitting Ricardo's stationhouse confession.

## III

In sum, we hold that because Ricardo's field detention constituted a de facto arrest unsupported by probable cause, the district court erred in denying Ricardo's motions to suppress. We therefore REVERSE the decision of the district court, VACATE Ricardo's conviction, and REMAND for further proceedings not inconsistent with this opinion.

---

**4.** In his first motion to suppress, appellant argued that any "evidence" should be suppressed as the fruit of an unlawful arrest. To the extent that any other evidence beyond Ricardo's statements was obtained during Ricardo's field detention, it must be suppressed as a direct result of the illegal detention. *See Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417–18.