**UNITED STATES of America,
Plaintiff–Appellant,**

**v.**

**Hernan RAMIREZ, Defendant–Appellee.**

No. 95–30158.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 1996.

Decided Aug. 2, 1996.

Stephen F. Peifer, Assistant United States Attorney, Portland, Oregon, for plaintiff-appellant.

Michael R. Levine, Deputy Federal Public Defender, Portland, Oregon, for defendant-appellee.

Before: REINHARDT, KOZINSKI, and FERNANDEZ, Circuit Judges.

Opinion by Judge Fernandez; Dissent by Judge Kozinski.

FERNANDEZ, Circuit Judge:

Hernan Ramirez was indicted for being a felon in possession of firearms. 18 U.S.C. § 922(g)(1). The district court determined that the firearms had been discovered in connection with a violation of Ramirez's rights under the knock-and-announce law. 18 U.S.C. § 3109. It, therefore, suppressed the evidence of the weapons, and the United States appealed. We affirm.

## BACKGROUND

On November 5, 1994, Ramirez and his wife awoke out of their peaceful slumbers to a series of unusual sounds, including the breaking of a window. Their child, too, awoke and started crying. They feared that they were being attacked by burglars. They were not, but by the end of the day Ramirez found himself in the custody of federal agents and charged with a crime—felon in possession of a firearm—which could lead to a lengthy period of incarceration. How he found himself in that predicament takes some telling.

Just three days before, Alan Laurence Shelby had knocked a deputy sheriff down and escaped from custody. He was then facing a term of federal imprisonment of 248 months and had declared that he would not do federal time. He had tried to escape before. One time he had struck an officer, kicked out a jail door, stolen an automobile, and rammed a police vehicle as he attempted to get away. Another time he had attempted to escape by using a rope made from torn bedsheets. At some time in the past he had also threatened to kill witnesses, and, it was said, he had tortured someone with a hammer.

The authorities were understandably anxious to get Shelby back, so they sent out a press release. Almost immediately, on November 3, 1994, a reliable confidential informant contacted Bureau of Alcohol, Tobacco and Firearms Special Agent George H. Kim

and told him that he had seen a person he believed to be Shelby at Ramirez's home the day before. Agent Kim and the informant then drove out to the area, and from some distance away they saw a person who was "very similar to" a photo of Shelby and noted that the man was wearing a blue jumpsuit and was clean-cut. That was the person the confidential informant had seen there the day before. Thereupon, a deputy marshal also went out, and from 1,000 yards away he saw a clean-cut man wearing blue sweats come out of the house. The marshal decided that the man was the person whom Agent Kim had seen.

In the afternoon of the next day, a warrant to arrest Shelby at Ramirez's home was obtained, and that led to the early morning raid on November 5, which brought Ramirez, but not Shelby, into the clutches of the law.

Ramirez's fateful day unfolded in this way. In the predawn hours of November 5, Ramirez, his wife, and their three-year-old child were asleep in their abode. The main house had three bedrooms, a living-room, an activity room, and a kitchen which led into a small utility room, which, in turn, led into an attached garage. The informant, who said that Shelby was at the house, also "indicated there were supposed to be several guns in the garage." Apparently there were not, and apparently the informant had never seen them there. Nevertheless, that is what he had said.

At 6:15 a.m., 45 armed officers converged on the property. The group included S.W.A.T. teams of state, county, and city officers. The officers set up a portable loud speaker system and began announcing that they had a search warrant, but without waiting for a response they broke the window of the garage and began waving a gun through that window, a maneuver that was not too efficacious because a curtain got in the way.

The Ramirezes had no idea that police were outside their home, but they did hear the disturbance, did hear the breaking of glass, and thought that they were being burglarized. They feared for their safety and for the safety of their three-year-old child. Thus, in order to frighten the intruder off, Mr. Ramirez obtained a pistol from a utility closet and fired it toward the ceiling of the garage. The officers fired back and shouted "Police." At that point, and only at that point, the occupants of the house realized that it was law enforcement officers who had broken into the home. Ramirez "ran to the living-room, threw away the firearm across the floor, and threw himself on the floor in a prone position, shaking from fright." By 6:35 a.m., he and his wife, with their child in her arms, had walked out of the house and into police custody. These householders were the only persons captured in the raid. Shelby was nowhere to be found, although Ramirez acknowledged that a photo of Shelby looked like a person who might have been there on November 3.

Based on what occurred at the house that morning, a second warrant was obtained, the gun which Ramirez had fired and another one were seized, and Ramirez found himself in the toils of the law.

## JURISDICTION AND STANDARD OF REVIEW

The trial court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731.

In general, we review determinations of motions to suppress de novo. *United States v. Khan,* 993 F.2d 1368, 1375 (9th Cir.1993). The trial court's factual findings are reviewed for clear error. *United States v. Negrete–Gonzales,* 966 F.2d 1277, 1282 (9th Cir.1992). Where no findings of fact were made or requested, this court will uphold a trial court's denial of a motion to suppress if there was a reasonable view to support it. *United States v. Rabe,* 848 F.2d 994, 997 (9th Cir.1988). The mixed fact and law question of exigent circumstances justifying a failure to comply with the statutory knock and announce provisions of 18 U.S.C. § 3109 is reviewed de novo. *United States v. McConney,* 728 F.2d 1195, 1205 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

*United States v. Becker,* 23 F.3d 1537, 1539 (9th Cir.1994).

## DISCUSSION

A. *Knock and Announce.* We have previously had occasion to expatiate on the important role that the Fourth Amendment plays in the protection of our homes—the centers of our family life and our refuge from the rude world. We must now cover that ground again.

As we said in *Los Angeles Police Protective League v. Gates,* 907 F.2d 879, 884 (9th Cir.1990):

> Nowhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved. *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886); *United States v. Shaibu,* 895 F.2d 1291, 1293 (9th Cir.1990) [, *amended and superseded by,* 920 F.2d 1423 (9th Cir.1990)]; *United States v. Winsor,* 846 F.2d 1569, 1574 (9th Cir.1988) (en banc). The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment. Therefore, we have been adamant in our demand that absent exigent circumstances a warrant will be required before a person's home is invaded by the authorities. *See Shaibu,* at 1293; *United States v. George,* 883 F.2d 1407, 1411 (9th Cir.1989).

The amendment's force, however, extends even beyond the obtaining of a warrant. Even if a warrant issues, the concerns which lie at the heart of the amendment continue to evoke our solicitude. Our "concern for the privacy, the safety, and the property of our citizens continues...." *Becker,* 23 F.3d at 1540. That concern is reflected in knock-and-announce requirements. As the Supreme Court recently said, "[i]n evaluating the scope of [our Fourth Amendment] right, we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing." *Wilson v. Arkansas,* —— U.S. ——, ——, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976 (1995). Among those traditions was "[t]he common law knock-and-announce principle [which] was woven quickly into the fabric of early American law." *Id.* at ——, 115 S.Ct. at 1917. The Court, therefore, concluded that as a matter of constitutional law "the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure." *Id.* at ——, 115 S.Ct. at 1918. For our purposes, the tradition finds an even more direct expression of societal concern. "It finds expression in the knock and announce statute which allows an officer to 'break open any outer or inner door of a house ... to execute a search warrant if, after notice of his authority and purpose,' he is refused admittance. 18 U.S.C. § 3109." *Becker,* 23 F.3d at 1540. We insist upon this notice because, as individuals, we fear for our privacy in the face of government might, and we fear for our property and our safety as well.

> "The fear of a smashing in of doors by government agents is based upon much more than a concern that our privacy will be disturbed. It is based upon concern for our safety and the safety of our families. Indeed, the minions of dictators do not kick in doors for the mere purpose of satisfying some voyeuristic desire to peer around and then go about their business. Something much more malevolent and dangerous is afoot when they take those actions. It is that which strikes terror into the hearts of their victims. The fourth amendment protects us from that fear as much as it protects our privacy...."

*Id.* at 1540 (citation omitted). *See also Soldal v. Cook County,* 506 U.S. 56, 62–63, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992). As concerned citizens we also fear the needless injuries that might be inflicted upon police officers, or upon a homeowner, as a result of the homeowner's mistaken belief that miscreants are invading his little castle. *See Sabbath v. United States,* 391 U.S. 585, 589, 88 S.Ct. 1755, 1758, 20 L.Ed.2d 828 (1968) (one facet of rule is to safeguard officers from injuries inflicted by mistaken homeowners). So it was here. Had Ramirez been less reasonable, the officer at the window might have been killed; had Ramirez been less wise, he or his family might have been killed. As it was, his property was needlessly damaged when his home was broken into.

When the officers executed the warrant they brushed aside the wisdom of history and elicited a response which, if not strictly intended, should have been reasonably foreseen. They seek to excuse their conduct on the grounds that the dangerousness of Shelby resulted in an exigency which permitted them to break into the home of Ramirez without following knock-and-announce requirements.

■ No doubt exigent circumstances can justify breaking into a house without notice, but "incantation of that phrase does not dissolve the shield that our law provides." *Becker*, 23 F.3d at 1540. When exigency is claimed, we must determine what kind of exigency it was. "We have held that even a mild exigency, like knowledge that a person is dangerous, can justify immediate entry where that can be done without any physical disruption of property. That, of course, is not this case." *Id.* (citations omitted). Here, an officer broke into the home through a window, poked a gun through the window, and was ready to fire the weapon if he deemed it necessary to do so. It takes more than a mild exigency to justify that. "To justify physical destruction of property '[m]ore specific inferences of exigency are necessary.'" *Id.* at 1541 (citation omitted). Was there more? We think not.

Consider. The 45 officers did not fear any of the actual residents of the house and were not attacking a gang or cult hangout where they might be met by a fusillade of gunfire. They were concerned about one person, Shelby, who might be on the premises. But Shelby was not known to have ever shot or shot at anyone. He was an escape artist, who said he would not go to federal prison. He had knocked people down in his escape attempts, and he had stolen a car and run into a police vehicle. His violence towards law enforcement had not extended beyond that, even though he had obviously been arrested on some occasions. Perhaps his degree of dangerousness bespoke a mild exigency. Certainly it did not bespeak more. In *United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc) *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), for example, we found a mild exigency when an officer knew that McConney was a member of Hell's Angels, had a conviction for a violent crime, was a drug dealer, and had spoken of protecting club members. *Id.* at 1206. That justified an announcement and a simultaneous entry through an unlocked screen door. *Id.*

On the other hand, in a case where a person in a drug dealer's apartment was known to own a gun, but there was no indication that he had the gun with him, we found no exigent circumstances at all. *See United States v. Fluker*, 543 F.2d 709, 717 (9th Cir. 1976). And in *United States v. Mendonsa*, 989 F.2d 366, 370–71 (9th Cir.1993), we found the circumstances insufficient to justify breaking into a house after the police heard a little noise, even though an occupant was a drug dealer who had a prior felony conviction for armed robbery. We also found no exigency where all the police had was a generalized concern about drug dealers. *See United States v. Moreno*, 701 F.2d 815, 817–18 (9th Cir.1983), *vacated on other grounds*, 469 U.S. 913, 105 S.Ct. 286, 83 L.Ed.2d 223 (1984). The same sort of generalized unspecific concerns proved insufficient in *Becker*, 23 F.3d at 1541.

We did find a mild exigency in *United States v. Von Willie*, 59 F.3d 922 (9th Cir. 1995), where the police sought to execute a search warrant at the home of an armed warlord for a motorcycle gang. *Id.* at 924. In that case, the police did attempt to comply with § 3109 at one door, did comply with it at another door, but seized Von Willie at still a third door without compliance after he had seen them and was trying to shut them out. Under the combination of what was known before plus what happened on the scene, we validated an entry which took place with no destruction of property. *Id.* at 925–26. Similarly, in *United States v. Scott*, 74 F.3d 175 (9th Cir.1996), *petition for cert. filed*, (June 6, 1996) (No. 95–9248), we found a mild exigency. The police arrived on the scene to execute a warrant. Scott opened the blinds and saw them; he had a weapon in his hand. *Id.* at 176. He then attempted to close an open door, as the police announced their presence and that they had a warrant. They then forced their way into the room. *Id.* at 177.

We were satisfied that there was a mild exigency, and we excused any failure to comply with the knock-and-announce rule. *See also United States v. Reed,* 15 F.3d 928, 934 (9th Cir.1994) (likely armed suspect saw the police and closed the door). None of those circumstances inform the case at hand. There is no suggestion that the police presence was known, no confirmation that Shelby was on the premises, and, more importantly, no indication that Shelby was armed and would resist with deadly force.

We were considerably more impressed when the police knew that the person they were after had a gun and had heard him say that he kept the gun to use against the police themselves. *United States v. Turner,* 926 F.2d 883, 885 (9th Cir.), *cert. denied,* 502 U.S. 830, 112 S.Ct. 103, 116 L.Ed.2d 73 (1991). We were equally impressed in *United States v. Perez,* 67 F.3d 1371, 1384 (9th Cir.1995), *reh'g en banc granted,* 77 F.3d 1210 (9th Cir.1996), and for much the same reasons. There the police on the scene realized that Perez probably knew they were present. Moreover, he was probably armed, had killed before, and had said that if arrested "he intended to 'go down shooting.'" *Id.* In both cases we did find more than a mild exigency. Of course, the police had no such information about Shelby. They neither knew that he had a gun, nor that he had access to one, nor that he would consider using one against them.

 We have touched upon all of these cases because our review is necessarily fact-bound. Our cases do not describe a simple straight line, rather they graph a much more complex curve. Police must have some leeway in balancing the demands of the knock-and-announce requirement against other safety considerations. Nevertheless, the courts must ultimately determine whether the police struck that balance properly. We

think it clear that the police did not do so in this case.

Again, the householders themselves presented no known danger. If he was there, Shelby might wish to escape, but the phalanx of already positioned officers on hand made escape unlikely. Moreover, there was no specific evidence that Shelby was armed, that he would use firearms against the officers, or that when he was faced with that show of force he would do anything violent at all. Also, before the break-in nothing developed on the scene which would have added to the circumstances already known and, thus, raise them to a higher degree of exigency. In short, we agree with the district court that the knock-and-announce rules were violated in this case.[1]

**B. *Causation.*** When Ramirez walked out of his house and into the arms of the waiting police, he was seized. He then admitted that he had fired the gun, that another gun was on the premises, and that he had previously committed felonies in California. Those admissions and the fact that an officer had seen the discarded pistol in the living-room led to a second warrant and a seizure of the weapons. It is the use of those weapons in evidence which Ramirez seeks to suppress.[2]

 Because the initial entry into Ramirez's house was illegal, he is entitled to have the weapons suppressed if "the police obtained the evidence 'by exploitation of the illegality.'" *United States v. Jones,* 608 F.2d 386, 390 (9th Cir.1979) (quoting *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)). It is clear that a mere "but for" causal connection will not lead to suppression. Rather, we must conduct an inquiry by applying three tests:

---

**1.** The careful reader will note that we have assumed that there was probable cause for the issuance of the warrant in the first place. There may well be some doubt about that, when the most that was known was that Shelby had been at Ramirez's house on two occasions two or three days earlier. Nevertheless, we give considerable deference to the issuing magistrate. *See Perez,* 67 F.3d at 1382. Because of that deference and because it is unnecessary to our resolu-

tion of this case, we have assumed rather than decided that there was probable cause.

**2.** We do not consider the statements themselves, which clearly were not severable from the arrest of Ramirez, because no issue regarding them is before us. *But see United States v. Ricardo D.,* 912 F.2d 337, 342 (9th Cir.1990) (confession following illegal arrest suppressed).

First, we consider the proximity of the illegal arrest with the seizure of the evidence. Second, we consider whether there were independent intervening events that led the police to the evidence. Third, we consider the effect of suppression on the exclusionary rule's purpose of deterring police misconduct. The three factors are closely interrelated.

*United States v. Shephard*, 21 F.3d 933, 939 (9th Cir.1994) (citation omitted); *see also Jones*, 608 F.2d at 391.

█ The first of these factors is easily met; the seizure of the guns could hardly be more proximately linked to the police break-in itself. They came as the most direct, if not the only, result of the morning's activities. Similarly, there can be little doubt that suppression would serve to dissuade the police from this kind of unnecessary invasion of people's homes. It would encourage, even exhort, them to use more caution. Only a particularly cynical view of government would induce us to think otherwise. The third factor weighs in favor of suppression.

█ That leaves the second factor—was there an independent intervening event? We think not, but that requires a bit more explanation. In the mine run of cases, the determination is relatively straightforward. If an unlawful search follows directly on the heels of an unlawful arrest, suppression will likely follow. *See, e.g., Shephard*, 21 F.3d at 939–40; *cf. Jones*, 608 F.2d at 390–91. If an unlawful search ultimately leads to the seizure of tangible materials, they, too, will be suppressed if their connection is close enough. *See Murray v. United States*, 487 U.S. 533, 536–38, 108 S.Ct. 2529, 2532–33, 101 L.Ed.2d 472 (1988); *United States v. Hill*, 55 F.3d 479, 481 (9th Cir.1995); *United States v. Santa Maria*, 15 F.3d 879, 883 (9th Cir.1994). If a confession is closely tied to an illegal arrest, suppression will often follow. *See Orhorhaghe v. INS*, 38 F.3d 488, 504 (9th Cir.1994); *Ricardo D.*, 912 F.2d at 343. The principles which animate these cases would seem to lead directly to a conclusion that suppression is required in this case. However, the government claims that there was an intervening event which broke the causal chain. That event was Ramirez's firing of the pistol at the ceiling when he thought that would help protect his family against malevolent intruders. We disagree with the government.

There was no gap or attenuation between the break-in and the firing of the weapon. More than that, the police were very lacking in perspicacity if they failed to foresee the reaction they encountered. What could they have expected when they broke into the home of a sleeping family in the early hours of the morning? If they did not intend to elicit a strong protective reaction, they must have willfully blinded themselves to that possibility. *Cf. United States v. Jewell*, 532 F.2d 697, 700–04 (9th Cir.) (en banc), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *United States v. Aguilar*, 80 F.3d 329, 332–33 (9th Cir.1996) (en banc).

The government, nevertheless, says that when a new illegal act intervenes, the chain is broken because police illegality should not be taken to justify citizen illegality. That general proposition is accurate enough in the abstract, but the cases which support it have no application here. No doubt a homeowner is not justified in aiming a semiautomatic weapon at persons he knows to be police officers, even if they happen to have entered his home illegally. *See United States v. Waupekenay*, 973 F.2d 1533, 1537–38 (10th Cir.1992). Similarly, when an officer is engaging in an illegal arrest, if the suspect engages in illegal resistance, that new violation may well justify a new and proper arrest. *See United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 195, 133 L.Ed.2d 130 (1995). We reached just that conclusion in *United States v. Garcia*, 516 F.2d 318 (9th Cir.), *cert. denied*, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975). In that case officers ordered Garcia to pull over at what we assumed to be an illegal checkpoint. Garcia did so at first, but then sped off and led the officers on a high-speed chase. *Id.* at 319. That illegal flight and the ensuing chase supplied the necessary intervening activity to justify Garcia's arrest. *Id.* at 320. We said that unless the officers had acted for the very purpose of initiating the chase activity, we would not find the second stop to be illegal. *Id.* at 319–20; *cf. United States v. Ogilvie*, 527 F.2d 330, 332 (9th Cir.1975) (explaining the limitations of *Garcia*); *United States v. Morrison*, 546 F.2d 319, 320 (9th Cir.1976) (same).

**1304**

In the case at hand, Ramirez did not threaten or flee from persons whom he knew to be police officers. Quite the contrary. He fired a gun at the ceiling of his own home when unknown intruders were invading it. The government does not claim that he committed a crime when he did that, unless, of course, the crime was the fact that he had a gun at all. But to the extent that it was a crime for him to have a gun, that crime did not intervene. It existed before the police engaged in their unlawful intrusion. That crime was brought to light by the intrusion itself. We agree with the Eleventh Circuit's determination that if the act of a suspect is not a new and distinct crime, but is simply a legal act which reveals the fact of some crime—such as possession of an illegal substance—it will not erase the taint. *United States v. Bailey,* 691 F.2d 1009, 1016–17 (11th Cir.1982), *cert. denied,* 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983). To paraphrase that decision: Ramirez was in possession of the gun before the police misconduct occurred, and his response to the misconduct only revealed this extant crime and did not itself constitute a crime—*i.e.,* firing a gun at the ceiling of his own home to scare off intruders is not a crime; possessing the weapon is. *Id.* at 1017.

We, therefore, determine that there was no intervening event, the second element of our analysis favors suppression, and suppression must follow.

### CONCLUSION

The flame of our Fourth Amendment liberties is bright and strong—that should come as no surprise. It has been tended by lovers of liberty for over two centuries. While it burns, it keeps our homes free from unlawful intrusions by the government. Still, it is just a flame, and it will be quickly quenched if it is not protected. Should that occur, a tenebrific atmosphere would envelop our liberties and our homes. That must not happen.

We hold that Ramirez's statutory and Fourth Amendment rights were violated when government agents broke into his home in the early morning hours without complying with the knock-and-announce requirements. We also hold that the district court correctly suppressed use of the seized weapons as evidence against him.

AFFIRMED.

KOZINSKI, Circuit Judge, dissenting.

1. The majority opens up a square conflict with *United States v. Turner,* 926 F.2d 883 (9th Cir.), *cert. denied,* 502 U.S. 830, 112 S.Ct. 103, 116 L.Ed.2d 73 (1991), a case where we upheld a no-knock entry. In *Turner,* police forced open a locked apartment door and entered the defendant's bedroom; Turner argued the no-knock entry was illegal because the police couldn't be sure he was armed, but we upheld the search. The majority contrasts Turner with Shelby, characterizing the former as a "considerably more impress[ive]" threat, maj. op. at 1301, and the latter as an "escape artist" whose "degree of dangerousness bespoke a mild exigency," if that. *Id.* at 1301.

The record contradicts the majority's romantic description of Shelby—a hardened and desperate criminal, much more dangerous than Turner. But words are cheap; here are facts:

| | Turner | Shelby |
|---|---|---|
| Current access to guns | Highly likely | Highly likely |
| Past access to guns | "Turner kept weapons in the apartment he used for his drug operations." | "Shelby was a major Methamphetamine manufacturer and has had access to large caches of weapons." |
| Threatened police | Yes | Yes |
| Threatened witnesses | No | Yes |
| Escape attempts | 0 | 3 |
| Police and civilians assaulted | 0 | 3 |
| People tortured | 0 | 1 |
| Criminal Record | 1 conviction for receiving stolen property, 17 years earlier | Serving 20 years plus, on state and federal charges, for dealing methamphetamines and using a gun in a drug transaction. |
| Knew police were looking for him | No | Yes |

My colleagues trip lightly over the fact that Shelby had "a history of violent escapes." ER at 22. But, in his dogged efforts to flee from custody, Shelby not only struck two law enforcement officers, but "assaulted a woman in a parking lot and stole her vehicle," *id.*; he then crashed into a police car in making his getaway. Assaulting helpless civilians and then using a ton of mechanized steel as a battering ram hardly comports with the majority's characterization of Shelby as a latter-day Harry Houdini. The majority also dismisses reports of Shelby's torture activities with "it was said," as if to suggest they lacked substance. Maj. op. at 1298. But the record is positive on this point: "Alan Shelby has brutally tortured others in the past with a hammer." ER at 22. The majority's characterization of Shelby as "[p]erhaps ... mildly dangerous," is more than mildly off the mark.

The majority posits two main distinctions between Shelby and Turner. First, it argues, Turner had threatened to kill police while Shelby had not. Wrong. Shelby had "made threats to kill witnesses and police officers associated with his incarceration." ER at 22. Next, the majority says, the police here didn't know Shelby had access to weapons, while the police in *Turner* did. Wrong again. In *Turner*, the police only knew that the suspect was armed at another location. Turner claimed the police had no way of knowing he would carry a gun with him, but we rejected his argument: Although "[the police] may not have had specific information that Turner currently had weapons, ... the facts they did have made this highly likely." 926 F.2d at 887.

Here, the police had more information about the suspect's access to weapons than in *Turner*. According to the Confidential Reli-

able Informant (CRI), Shelby was hiding in the home of another suspected drug dealer, ER at 52; two law enforcement officers confirmed that someone matching Shelby's description was on the premises. ER at 23–24. The CRI also told police that "there were supposed to be guns in the garage," ER at 52, a garage attached to the house where Shelby was thought to be hiding. Police thus not only were informed that Shelby was at that location, but that there were guns there—something the police in *Turner* merely surmised. The police in our case did have to infer that Shelby or someone else in the house might go for the guns if cornered but, as we said in *Turner*, "the facts that [the police] did have made this highly likely." 926 F.2d at 887.

The majority's every effort to disparage the search here only underscores the conflict with *Turner*. The majority criticizes the police for failing to recognize they "were not attacking a gang or cult hangout where they might be met by a fusillade of gunfire," maj. op. at 1301; the same was true in *Turner*. The majority complains that "[t]here is no suggestion that the police presence was known," *id.* at 1302; Turner complained about the exact same thing. *See* 926 F.2d at 887. The majority points out that "the phalanx of already positioned officers on hand made escape [by Shelby] unlikely," maj. op. at 1302; in *Turner*, we held that "[t]he number of officers surrounding the building and Turner's lack of prior charges for escape are irrelevant." 926 F.2d at 887. The majority carps, "Shelby was not known to have ever shot or shot at anyone," maj. op. at 1301; Turner hadn't even committed a violent crime. Every argument the majority makes here was considered and rejected in *Turner*.[1]

---

1. Any material differences between this case and *Turner* cut against the majority's conclusion. First, the intrusion in *Turner* was much more serious than that here. In *Turner*, police broke into the apartment and "found Turner in bed with a woman." 926 F.2d at 886. Here, they broke a single window of the *garage* where they were told the guns were located and poked a gun through the hole. Quite clearly, this was an effort to keep Shelby (or whoever else was in the house) from making a run for the weapons. While the maneuver failed, it was a rational and measured effort by the police to deal with the

dangerous situation presented to them. The search here was also much less troublesome than in *Turner* because police had obtained a no-knock warrant. In *Turner*, police decided to break down the door unilaterally and on the spur of the moment. Finally, unlike in *Turner*, police here tried, albeit unsuccessfully, to announce their presence. ER. at 53 (the police announced their presence over a loud speaker, but Ramirez could not determine what was going on); *see United States v. Moreno*, 701 F.2d 815, 817 n. 3 (9th Cir.1983) ("An attempt to notify by knocking and announcing complies with the statute wheth-

My colleagues try to duck *Turner* by claiming that our cases "graph a ... complex curve." *Id.* at 1302. But if the law is that much in turmoil, we must call for sua sponte en banc. *See Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1479 (9th Cir.1987) ("A panel faced with [an irreconcilable] conflict must call for en banc review...."). In fact, there is no pre-existing conflict because *Turner* is the only case on point. The other cases the majority cites did not involve the breaking of property;[2] no more than a mild exigency was thus required to uphold those entries. These cases did not—could not—speak to whether a more serious intrusion was warranted.

The majority's ruling not only creates a circuit conflict, it's bad law on its own terms. There is much rhetoric in the opinion about the sanctity of every man's "little castle," but the principal reason we can sleep safely at night is that the men and women of law enforcement put their lives on the line to keep our castles from being invaded by brutal criminals. When police track down "a major Methamphetamine manufacturer[, who] has had access to large caches of weapons" and a history of torture and other violent conduct, they are entitled to take precautions. A castle, little though it be, often looks like a fortress from the outside; police cannot know what's lurking within. It's easy enough, sitting in our well-guarded offices, and with the benefit of hindsight, to issue pronouncements about what the police should or could have done, but this provides little useful guidance to police in the field who must make difficult judgments in unknown territory and subject to unpredictable developments. What if the police had adopted the majority's rosy view of Shelby and had politely tapped at the door and asked if he would come along, but Shelby had seized the guns in the garage, taken the Ramirez family hostage and precipitated a shoot-out? No doubt, we would then have issued a similarly smug opinion, this time lecturing the police that they were not free to ignore the words and warnings of their CRI, and affirming the payment of compensation to the Ramirezes or anyone else harmed in the altercation.

My guess is that, had any of us been in charge of this operation—had we been responsible for the lives and safety of dozens of law enforcement officers and the family sleeping inside—we would have done just what the police here did. To have done less would have been foolhardy (my colleagues' high-fallutin' rhetoric notwithstanding); to have done more would have been excessive. The police properly balanced the homeowner's privacy and property interests against the dictates of security. *See Wilson v. Arkansas*, —— U.S. ——, ——, 115 S.Ct. 1914, 1918, 131 L.Ed.2d 976 (1995) ("The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests."); *United States v. Bustamante-Gamez*, 488 F.2d 4, 10 (9th Cir.1973) ("[I]t has never been suggested that the [no-knock] requirement is an inflexible one; both at common law and in the constitutional context the courts have acknowledged that the interests [protected by the rule] may give way to other considerations."), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). They deserve to be congratulated, not chastened and ridiculed.

2. Even had the no-knock search been illegal, this would provide no grounds for suppression of the evidence pertaining to Ramirez. In reaching the contrary conclusion, the majority raises conflicts with two other of our cases, *United States v. Jones*, 608 F.2d 386 (9th Cir.1979), and *United States v. Garcia*, 516 F.2d 318 (9th Cir.), *cert. denied sub nom. Martinez–Lopez v. United States*, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975). In *Jones*, the police arrested the defendant on suspicion of a Los Angeles area burglary and found a motel room key on him; they then searched the room and discovered evidence of an unrelated burglary at San Francisco's Presidio. Although the initial arrest

---

er or not it is heard."), *vacated on other grounds*, 469 U.S. 913, 105 S.Ct. 286, 83 L.Ed.2d 223 (1984).

**2.** *E.g., United States v. Von Willie*, 59 F.3d 922 (9th Cir.1995); *United States v. Scott*, 74 F.3d 175 (9th Cir.1996); *United States v. Reed*, 15 F.3d 928 (9th Cir.1994).

was illegal, evidence obtained from the motel room was not excluded because exclusion could have had no deterrent value. We held it "crucial" that the police were not investigating the Presidio burglary when they illegally found the evidence, because "[d]eterrence can have its effect only when it can be said that an object of the illegal conduct was the securing of the evidence sought to be suppressed." *Id.* at 391 (quoting *Allen v. Cupp,* 426 F.2d 756, 759 (9th Cir.1970)). Here, the police weren't out to catch a felon in possession; they didn't even know Ramirez owned the house, much less that he was a felon.[3] The object of the supposedly illegal search was the arrest of Alan Shelby for escape; police couldn't possibly be deterred by the threat of exclusion of evidence relating to a completely different person and crime. *Cf. Allen,* 426 F.2d at 759 (exclusion when illegal police conduct inadvertently reveals evidence would merely "make tasting the fruit more difficult, but would not diminish its temptation").

The majority leaps over the deterrence question with a single bound: "[T]here can be little doubt that suppression would serve to dissuade the police from this kind of unnecessary invasion of people's homes." Maj. op. at 1303. This is contrary to *Jones* and other cases where we have held that suppression can provide no deterrence when police officers, through "investigatory serendipity," stumble across evidence of a crime of which they were previously unaware. *See United States v. Bacall,* 443 F.2d 1050, 1056 (9th Cir.) (it's "crucial to a determination of taint" that police didn't suspect the defendant of the crime for which their illegal activity produced evidence), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971); *Durham v. United States,* 403 F.2d 190, 196 (9th Cir.1968) ("The price is too high and the

advantage too uncertain to make it reasonable to suppose that law enforcement officers will be encouraged to indulge in unlawful searches, knowing that what they find will be suppressed, in the hope of obtaining admissible evidence as remote and fortuitously acquired as this.").

The majority creates yet a third conflict, this time with *United States v. Garcia.* Garcia was stopped at an illegal checkpoint but then sped off and was captured; police searched the car and found marijuana. We declined to suppress. The suspect's intervening act, we held, gave police new grounds for probable cause that were untainted because police didn't intend to provoke the response. *Garcia,* 516 F.2d at 320 ("By ordering [the defendant] to stop, the officer could hardly have intended him to flee."). Here, police developed new grounds for searching Ramirez's house when he fired his gun. Following *Garcia's* rationale, Ramirez's use of the gun was evidence untainted by the (supposed) earlier illegality, unless police *intended* to provoke the response. It's ludicrous to suppose the police broke the garage window hoping to provoke those inside to shoot at them. The majority claims, inexplicably borrowing a deliberate ignorance instruction from substantive criminal law, that the police "willfully blinded themselves to [the] possibility" of Ramirez's response, maj. op. at 1303 (citing *United States v. Jewell,* 532 F.2d 697, 700–04 (9th Cir.), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976)). But, according to *Garcia,* the test isn't willful blindness, it is intent. Far from intending that the occupants of the house shoot at them, the police here tried to prevent a shoot-out by covering the area where they thought the guns were stored.

---

**3.** Ramirez apparently was fond of pseudonyms. Utility records indicated a "Hernan Rios" lived at 23170 S.E. Bohna Park Rd. ER. at 24. The CRI, however, said the owner went by "Angel" or "Havannah." *Id.* DMV records showed an "Angel Rios" had a driver's license in the name "Angel Estrada." *Id.* Even after the raid, the police weren't sure who Ramirez was. The affidavit for the second warrant seeks to search "the premises occupied by Herman Ramirez aka Hernan Ramirez, Angel Estrada." *Id.* at 44.

Ramirez's criminal record was also unknown to the police before the search. After the search, Ramirez told police that his birthday was May 8, 1957, and he had been convicted of burglary in 1981. *Id.* at 45. Only then did a check of police records reveal a Hernan or Herman Ramirez who was born on May 8, 1955 and was convicted of rape in 1978 and burglary with a firearm in 1982. *Id.* at 46.

Because Ramirez's intervening act was not "the *intended result* of illegal police conduct," *Garcia*, 516 F.2d at 319 (emphasis added), it attenuates the alleged taint from the no-knock entry.

\* \* \*

Because I cannot join in this wholesale flouting of circuit authority and common sense, I dissent.