**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JIM MAXWELL, individually and as
guardian of Trevor Allen Bruce and
Kelton Tanner Bruce; KAY
MAXWELL, individually and as
guardian of Trevor Allen Bruce and
Kelton Tanner Bruce; JIM
MAXWELL, as executor of the Estate
of Kristin Marie Maxwell-Bruce,
             *Plaintiffs-Appellants*,

v.

COUNTY OF SAN DIEGO; ALPINE FIRE
PROTECTION DISTRICT; VIEJAS FIRE
DEPARTMENT; LOWELL BRYAN
"SAM" BRUCE, Deputy; BRADLEY
AVI; JEREMY FELBER; GREGORY
REYNOLDS; ANTHONY SALAZAR;
M. KNOBBE; JEFFREY JACKSON;
WARREN VOTH; GARY KNEESHAW;
WILLIAM REILLY; L. RODRIGUEZ;
BRIAN BOGGELN; COLBY ROSS; CHIP
HOWELL; MICHAEL MEAD; DOES,
             *Defendants-Appellees*.

No. 10-56671

D.C. No.
3:07-cv-02385-
JAH-WMC

JIM MAXWELL, individually and as
guardian of Trevor Allen Bruce and
Kelton Tanner Bruce; KAY
MAXWELL, individually and as
guardian of Trevor Allen Bruce and
Kelton Tanner Bruce; JIM
MAXWELL, as executor of the Estate
of Kristin Marie Maxwell-Bruce,
                *Plaintiffs-Appellees*,

                    v.

COUNTY OF SAN DIEGO; ALPINE FIRE
PROTECTION DISTRICT; VIEJAS FIRE
DEPARTMENT; LOWELL BRYAN
"SAM" BRUCE, Deputy; BRADLEY
AVI; JEREMY FELBER; BRIAN
BOGGELN; COLBY ROSS; CHIP
HOWELL; MICHAEL MEAD; DOES,
                *Defendants*,

                    and

GREGORY REYNOLDS; ANTHONY
SALAZAR; M. KNOBBE; JEFFREY
JACKSON; WARREN VOTH; GARY
KNEESHAW; WILLIAM REILLY; L.
RODRIGUEZ,
                *Defendants-Appellants*.

No. 10-56706

D.C. No.
3:07-cv-02385-
JAH-WMC


ORDERS AND
OPINION

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted
March 7, 2012—Pasadena, California

Filed February 14, 2013

Before: Jerome Farris, Richard R. Clifton,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Farris;
Dissent by Judge Ikuta

**SUMMARY**[*]

**Civil Rights**

In these consolidated appeals, the panel affirmed the
district court's summary judgment denying qualified
immunity to San Diego Sheriff's Department deputies and
reversed the district court's dismissal, on sovereign immunity
grounds, of the Viejas Band Tribal Fire Department
paramedics. Plaintiffs, the surviving parents and children of
Kristin Marie Maxwell-Bruce, brought this 42 U.S.C. § 1983
action following the shooting of Kristin by her husband,
Sheriff Deputy Lowell Bruce. Plaintiffs sued the law

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

enforcement officials and paramedics who arrived at the scene in the aftermath of the shooting.

The panel first held that the delay of Kristin's ambulance violated the Fourteenth Amendment due process clause and that Sheriff's officers were liable under the danger creation exception. The panel determined that officers found Kristin facing a preexisting danger from her gunshot wound and they affirmatively increased that danger by preventing her ambulance from leaving. The panel also held that plaintiffs' multi-hour detention and separation violated the Fourth Amendment's ban on unreasonable seizures, given that officers never claimed they had probable cause to arrest plaintiffs or a reasonable suspicion for a temporary *Terry* detention. The panel further held that officers violated the Fourth Amendment when they pepper sprayed plaintiff Jim Maxwell because there was no evidence that he was resisting arrest.

The panel held that Captain Reynolds and Lieutenant Salazar were liable for the actions of their subordinates because a jury could reasonably conclude they tacitly endorsed the other Sheriff's officers' actions by failing to intervene. Finally, the panel held that the Viejas Fire Department paramedics, who were sued as individuals, did not enjoy tribal sovereign immunity because a remedy under § 1983 would operate against them in their individual capacities, not against the tribe.

Dissenting, Judge Ikuta stated that under the existing case law, the Sheriff's deputies were entitled to qualified immunity.

**COUNSEL**

Daniel M. Benjamin, Ballard Spahr LLP, San Diego, California, and Todd Thibodo, Law Offices of Todd Thibodo, Encino, California, for Plaintiffs-Appellees/Plaintiffs-Appellants.

Morris G. Hill, Senior Deputy, San Diego County Counsel, San Diego, California, for Defendants-Appellants Gregory Reynolds, Anthony Salazar, Michael Knobbe, Jeffrey Jackson, Warren Voth, Gary Kneeshaw, William Reilly, and Leonard Rodriguez.

Phillip C. Samouris, John M. Morris, and Victoria E. Fuller, Higgs, Fletcher & Mack LLP, San Diego, California, for Defendants-Appellees Viejas Fire Department, Bradley Avi, and Jeremy Felber.

---

**ORDER**

The panel has voted to deny the petition for rehearing in case number 10-56671; Judges Clifton and Ikuta vote to deny the petition for rehearing en banc, and Judge Farris so recommends.

Judges Farris and Clifton vote to deny the petition for rehearing in case number 10-56706; Judge Clifton votes to deny the petition for rehearing en banc, and Judge Farris so recommends. Judge Ikuta votes to grant the petition for rehearing and the petition for rehearing en banc.

The full court has been advised of the petitions for rehearing en banc and no judge has requested a vote on whether to rehear the matters en banc. Fed. R. App. P. 35.

The petitions for panel rehearing and the petitions for rehearing en banc are DENIED.

---

## ORDER

The Opinion and Dissent filed September 13, 2012, slip opinion number 11179, and appearing at 697 F.3d 941, is withdrawn.  It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.

---

## OPINION

FARRIS, Circuit Judge:

These associated appeals concern the aftermath of the shooting of Kristin Marie Maxwell-Bruce by her husband, Lowell Bruce.

## I

Around 10:50 PM on December 14, 2006, Lowell, a San Diego County Sheriff's Department deputy, shot Kristin in the jaw with his Glock .40 caliber service pistol in the couple's bedroom.[1] At the time, Lowell and Kristin lived in

---

[1] These cases come to us in different procedural postures and thus require us to consider different parts of the record. Case 10-56706 follows the denial of summary judgment. We review that decision in light of the

the home of Kristin's parents, Jim and Kay Maxwell, along with Lowell and Kristin's children and Kay's father, Fred Stevens. Kristin was able to call 911 for help. Lowell also called 911 and told the 911 dispatcher that he had shot Kristin.

Deputy Jeffrey Jackson of the Sheriff's Department was dispatched to the scene and arrived at about 10:53 PM. Jackson, along with Bill Davis, a neighbor who happens to be a San Diego Police Department sergeant and who was apparently notified of the shooting via telephone by Jim, went into the Maxwell house. Jackson knew before he went into the house that the suspect was a fellow deputy sheriff. When Jackson arrived, he saw Kristin sitting in a chair, still talking to the 911 dispatcher. Jackson walked past Kristin and determined that Lowell was not a threat. Jackson took Lowell's phone and told the 911 dispatcher to send the fire department. Jackson then escorted Lowell to Jackson's patrol car. Jackson did not frisk Lowell for weapons or handcuff him.

Rani Gibbs, a neighbor of the Maxwells and a nurse, entered the house at about 10:58 PM. Gibbs found Kristin

---

"depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" in the record. Fed. R. Civ. P. 56(c)(1)(A). Case 10-56671 follows the grant of a motion to dismiss for lack of subject matter jurisdiction. In reviewing such a dismissal, "we may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011) (internal quotation marks omitted). We recite the cases' shared backgrounds together for the reader's convenience but limit our analysis of each claim to the appropriate parts of the record.

sitting in a chair, conscious, alert and oriented. At about 11:00 PM, an Alpine Fire Protection District fire truck arrived, carrying Captain Brian Boggeln, firefighter Colby Ross, and emergency medical technicians Michael Mead and Gerald Howell II. Their fire truck did not have space for a gurney.

Sheriff's Department Deputies William Reilly, Leonard Rodriguez, Warren Voth, and Gary Kneeshaw also arrived at the scene around 11:00 PM. Voth and Kneeshaw were initially told they were not needed and prepared to leave. Jackson ordered Rodriguez to stay near the former's patrol car and went back into the house with Reilly, where they retrieved Lowell's gun.

The Alpine responders entered the house a few minutes later, and Gibbs left shortly thereafter. Ross and Mead also came in and began a medical examination of Kristin. The Alpine responders determined that Kristin's vital signs and motor responses were normal and that she was able to communicate. They also diagnosed her with an airway obstruction. Boggeln and Ross placed a c-spine collar on Kristin.

The Alpine responders concluded that Kristin had to go to a trauma center quickly. They requested an air ambulance, which they believed to be the fastest mode of transport, and were informed it would arrive in 25 minutes at a landing zone 10 miles away. The air ambulance had advanced medical capabilities for dealing with trauma patients.

Around 11:08 PM, an ambulance from the Viejas Band of Kumeyaay Indians Tribal Fire Department arrived. The Viejas Fire ambulance, which carried paramedics Bradley

Avi and Jeremy Felber, could transport Kristin to the landing zone.

At the time, Kristin's vital signs were still within normal limits. The ambulance did not leave immediately. Rather, at some point, the ambulance's engine was turned off. Sometime between 11:10 and 11:15 PM, Fred Stevens saw Kristin sitting alone in the dining room, holding a towel to her jaw.

Eventually, Avi and Felber brought in their backboard and gurney. With help from Ross and Mead, they placed Kristin on the backboard and taped her into place. The four men then carried Kristin to the Viejas Fire ambulance. When they arrived at the ambulance, Kristin began exhibiting signs of distress, expelling blood from her mouth. The four men tilted the backboard to allow the blood to drain, and Ross suctioned the blood. They made other efforts to assist her without success.

Meanwhile, Sergeant Michael Knobbe had arrived at the scene at 11:16 PM. Knobbe believed himself to be in charge. He was in fact outranked by Captain Gregory Reynolds and Lieutenant Anthony Salazar, who arrived around the same time as Knobbe. Nonetheless, Reynolds and Salazar stayed near the end of the driveway and did not interfere with Knobbe taking control of the crime scene.

Knobbe ordered Voth and Kneeshaw to stay at the crime scene. He also ordered the house evacuated and sealed and the Maxwells separated. Kay, Fred, and the children were placed in a motor home on the driveway. Jim was allowed to pace around the front of the driveway. Jim and Kay repeatedly asked to be allowed to stay together and follow

Kristin to the hospital. They also told the deputies that they had not seen or heard anything involving the shooting. Nonetheless, they were told they had to stay and wait separately for investigators to interview them.

Based on Alpine's estimates, Kristin was placed in the Viejas Fire ambulance between 11:18 and 11:25 PM. Sergeant Knobbe, however, refused to let the ambulance leave immediately because he viewed the area as a crime scene and thought that Kristin had to be interviewed. As a result of the delay, the ambulance did not leave until 11:30 PM. By that point, the air ambulance had already gotten to the landing zone.

The Viejas Fire ambulance took 11 minutes to get to the landing zone. Kristin died en route. The cause of death was blood loss from her gunshot wound. According to the San Diego County medical examiner, Kristin's injuries were repairable.

At about 12:45 AM, Knobbe told Jim—who was still pacing on his driveway—that Kristin had died. At around 1:00 AM, Knobbe assigned Deputy Kneeshaw to monitor Jim. Jim told Kneeshaw that he was going to tell Kay about Kristin's death. Kneeshaw told Jim that he had to stay put at the end of the driveway, to which Jim responded, "You are gonna have to shoot me, I'm going to see my wife!" Jim started to walk toward the mobile home. Kneeshaw told Jim to stop and tried to block his path. When Jim tried to continue walking, Kneeshaw sprayed him three times with pepper spray, struck him on the leg with his baton, and handcuffed him with Knobbe's help. Salazar and Reynolds were still at the end of the driveway and did not intervene.

Jim was released from his handcuffs about half an hour later. He was still kept separate from the rest of his family until investigators finished interviewing Kay around 5:00 AM. Kay and the other family members did not learn about Kristin's death until then.

The Maxwells sued several parties after the night's events. These interlocutory appeals concern two sets of claims. In the first, the Maxwells allege various constitutional violations by Jackson, Reilly, Rodriguez, Voth, Kneeshaw, Knobbe, Reynolds, and Salazar (the "Sheriff's officers") pursuant to 42 U.S.C. § 1983. In the second, the Maxwells seek tort damages under California law against the Viejas Fire Department and its paramedics, Avi and Felber (the "Viejas defendants"), pursuant to 28 U.S.C. § 1367(a).

After discovery, the Sheriff's officers moved under Federal Rule of Civil Procedure 56 for summary judgment on the basis of qualified immunity. The Viejas defendants moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction, arguing they enjoyed tribal sovereign immunity. The district court denied the former motion and granted the latter.

## II

We review *de novo* the district court's ruling on summary judgment on the basis of qualified immunity. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1075 (9th Cir. 2011). "Our jurisdiction in these matters generally is limited to questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact . . . . Where disputed facts exist, however, we can determine whether the denial of qualified

immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct." *Jeffers v. Gomez*, 267, F.3d 895, 903 (9th Cir. 2001). We also review *de novo* the district court's determination that it lacks subject matter jurisdiction because of tribal sovereign immunity. *Linneen v. Gila River Indian Cmty.*, 276 F.3d 489, 492 (9th Cir. 2002).

## III

We begin with the district court's denial of summary judgment to the Sheriff's officers on the ground of qualified immunity. Qualified immunity protects government officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to qualified immunity, we ask, in the order we choose, (1) whether the alleged misconduct violated a right and (2) whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

## A

The Maxwells' first claim alleges that the delay of Kristin's ambulance violated the Fourteenth Amendment's due process clause. The due process clause guarantees the right to "bodily security." *Kennedy v. City of Ridgefield*,

439 F.3d 1055, 1061 (9th Cir. 2006). The Maxwells contend that the Sheriff's officers violated Kristin's right to bodily security by delaying her ambulance and thus ensuring her death.

Normally, the Sheriff's officers could not be held liable under § 1983 for an injury inflicted by a third party. *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). There are, however, "two exceptions [to this rule]: (1) the 'special relationship' exception; and (2) the 'danger creation' exception." *Id.* The Maxwells contend that either or both exceptions apply.

We agree that the danger creation exception applies. As of December 2006, it was well-established in this circuit that the danger creation exception applies where government officers "affirmatively placed the [victim] in a position of danger." *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir. 1989) (internal quotation marks omitted). Officers affirmatively place a person in danger by leaving her "in a situation that [is] more dangerous than the one in which they found h[er]." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). Impeding access to medical care amounts to leaving a victim in a more dangerous situation. *See Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997).

The Sheriff's officers found Kristin facing a preexisting danger from her gunshot wound. There is evidence they affirmatively increased that danger by preventing her ambulance from leaving. This arguably left Kristin worse off than if the ambulance had been allowed to bring her to an air ambulance that had advanced medical capabilities and was ready to fly her to a trauma center.

The Sheriff's officers argue that our danger creation cases are distinguishable because they did not involve first responders securing a crime scene. But "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. The existence of a crime scene does not change our analysis. It was irrelevant to the delay of the ambulance. The ambulance contained no witnesses or evidence apart from the victim herself and her wounds. Lowell had confessed and was in custody. The Sheriff's officers had found the gun used in the crime. The crime scene was sealed.

The Sheriff's officers also argue they lacked the *mens rea* to be held liable under § 1983, claiming the record does not show "deliberate indifference . . . to known or obvious dangers." *Nicholas v. Wallenstein*, 266 F.3d 1083, 1087 (9th Cir. 2001). We reject the argument. It was obvious that delaying a bleeding gun shot victim's ambulance increased the risk of death.

Finally, the Sheriff's officers appear to argue that the Maxwells must show that they acted with a "purpose to harm" Kristin since this case involved a medical emergency calling for split-second decisions. *See Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008). This contradicts their earlier recognition that the appropriate standard is one of deliberate indifference. It also nonsensically suggests that a medical emergency faced by third parties justified the decision to prevent those parties from responding to that emergency.

**B**

The Maxwells next allege that their multi-hour detention and separation violated the Fourth Amendment's ban on unreasonable seizures. We accept for the purpose of this appeal the Maxwells' allegation that they were subject to seizure. The Sheriff's officers did not challenge this allegation in the district court or in their opening brief on appeal. They therefore waived the argument raised in their reply brief that there was no seizure. *See Taniguchi v. Schultz*, 303 F.3d 950, 958–59 (9th Cir. 2002); *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

The remaining question is whether, under our pre-December 2006 precedent, the detention was reasonable. Under the Maxwells' version of the facts, they were seized for over five hours solely because they were witnesses to a crime. In deciding whether this was reasonable, we look to "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51 (1979).

We note there are few cases discussing the reasonability of detaining witnesses solely for investigative purposes. In most cases, the lack of on-point precedent would compel us to grant qualified immunity. To apply a legal right at "a high level of generality would allow plaintiffs 'to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Groh v. Ramirez*, 540 U.S. 551, 578 (2004) (Thomas, J., dissenting) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)) (alteration in original).

Nevertheless, "in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). This is an obvious case. Although detention of witnesses for investigative purposes can be reasonable in certain circumstances, such detentions must be minimally intrusive.

In *United States v. Ward*, 488 F.2d 162 (9th Cir. 1973) (en banc), we held that FBI agents' detention of a person without "a founded suspicion of criminal activity" was unconstitutional. *Id.* at 169. There was no suspicion that the defendant had been involved in a particular crime. *Id.* Rather, the stop was pursuant to a pre-existing criminal investigation and was made for the purpose of questioning the defendant about a third person. *Id.*

*Ward* has been read to prohibit involuntary detention of witnesses to a crime. *See Walker v. City of Orem*, 451 F.3d 1139, 1148 (10th Cir. 2006). We do not read it quite so broadly. *Ward* contained two caveats that left the door open to investigatory witness detentions. First, it noted that the detention did not involve an "emergency situation." 488 F.2d at 169. Second, it distinguished between federal agents—who can enforce only federal statutes—and local law enforcement officers—who have broader authority to detain as general "guardians of the peace." *Id.*

Nonetheless, *Ward* clearly restricts investigative witness detentions by showing that in the hierarchy of state interests justifying detention, the interest in detaining witnesses for information is of relatively low value. *Ward* began its analysis by comparing the challenged detention to the type of investigative stop authorized by *Terry v. Ohio*, 392 U.S. 1 (1968). *Ward* noted that *Terry* made "suspicion that criminal

activity is afoot" the prerequisite for a lawful detention. 488 F.2d at 169. By using *Terry* as a starting point, *Ward* made clear that detention without suspicion of criminal activity involved a lesser state interest than a detention based on such a suspicion.

The Supreme Court decision authorizing detentions solely for the purpose of obtaining information confirms this common sense rule. In *Illinois v. Lidster*, 540 U.S. 419 (2004), the Supreme Court considered a traffic checkpoint set up so police could ask for information about a hit and run incident. The Supreme Court applied its normal Fourth Amendment reasonableness inquiry and determined the detentions were reasonable. The "[m]ost important[]" reason, it explained, was that "the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect." *Id.* at 427. The overall delay was "a very few minutes at most," contact with the police "lasted only a few seconds," and the contact "consisted simply of a request for information and the distribution of a flyer." *Id.* at 427–28. By focusing on the traffic stop's minimal intrusion on personal liberty, *Lidster* confirmed that the state interests justifying investigative witness detentions are lower than those justifying detention of suspected criminals.

We conclude that the Sheriff's officers were on notice that they could not detain, separate, and interrogate the Maxwells for hours. The Sheriff's officers have never claimed they had probable cause to arrest the Maxwells or reasonable suspicion for a temporary *Terry* detention. The crime was solved, and even if it had not been, it is a "settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer." *Davis*

*v. Mississippi*, 394 U.S. 721, 727 n.6 (1969). Even in the *Terry* stop context—which involves a suspicion of criminal activity that is absent here—the Supreme Court has never endorsed a detention longer than 90 minutes. *See United States v. Place*, 462 U.S. 696, 709–10 (1983).

The Sheriff's officers' reliance on *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), is unavailing. In *Walker*, police officers shot a man and then forced his family into their house and interrogated them for 90 minutes. 451 F.3d at 1145. The Tenth Circuit held the detention was unconstitutional but granted qualified immunity because there was no clear circuit precedent prohibiting such a detention. *Id.* at 1151. This decision does not show the right was uncertain in this case. *Walker* held a detention like the one here unconstitutional six months before December 2006. *Walker* also noted that our circuit has clearly established case law on investigative witness detentions and strongly suggested it would have ruled differently if our holding in *Ward* governed. *Id.* at 1148. Further, *Walker* noted that the events in question predated *Lidster*. Thus, unlike the Sheriff's officers, the officers in *Walker* were not necessarily on notice that witness detention was subject to the Fourth Amendment reasonableness test. *See* 451 F.3d at 1151.

We also reject the argument that various exigencies made the detention reasonable as a matter of law. The Sheriff's officers cite *Muehler v. Mena*, 544 U.S. 93 (2005), which held that "[a]n officer's authority to detain incident to a search is categorical." *Id.* at 98. *Muehler* is inapposite. The Maxwells' detention was not incident to a search. The Sheriff's officers did not obtain a search warrant until more than four hours after the detention began. The Maxwells were

not "occupant[s] of [their house] at the time of the search." *Id.* at 98.

The Sheriff's officers also cite *Illinois v. McArthur*, 531 U.S. 326 (2001), which allows warrantless seizures to prevent the destruction of evidence while law enforcement obtains a search warrant. There is, however, ample evidence that there was no such threat, and we have no jurisdiction in this interlocutory appeal to weigh sufficiency of the evidence. *Mattos v. Angarano*, 661 F.3d 433, 439 n.2 (2011) (en banc). The perpetrator was in custody and the crime scene was sealed. The Maxwells followed orders to leave their house. Moreover, the Sheriff's officers arguably could have protected the integrity of the crime scene without detaining witnesses there. *See Walker*, 451 F.3d at 1149.

Last, the Sheriff's officers point to their need to secure the crime scene. But there is evidence they did not perceive such a need at the time. The Sheriff's officers were on the scene for over 20 minutes before Knobbe ordered the house evacuated. By that time, Lowell had confessed and voluntarily gone into custody. Jackson took Lowell into custody without handcuffing him or frisking him for weapons. We note again that weighing this evidence is beyond our jurisdiction. *Mattos*, 661 F.3d at 439 n.2.

## C

The Maxwells also claim that Jim's treatment when he tried to rejoin his family violated the Fourth Amendment. When Jim tried to rejoin his family, he was pepper-sprayed, struck with a baton, and handcuffed. The Maxwells allege that these acts constituted an arrest (1) without probable cause and (2) with excessive force. Either type of arrest is an

unreasonable seizure. *Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992); *White v. Pierce Cnty.*, 797 F.2d 812, 816 (9th Cir. 1986). We accept for the purposes of this appeal the Maxwells' allegation that Jim was arrested. Thus, the questions are whether, under our pre-December 2006 precedent, probable cause existed or the degree of force was excessive. We conclude that there was no probable cause and the force was excessive.

Probable cause exists if the arresting officers "had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that [the arrestee] had committed or was committing a crime." *United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990). The only crime identified by the Sheriff's officers is Jim's refusal to obey Deputy Kneeshaw's order not to rejoin his family. They argue this was a violation of California Penal Code § 148(a), which makes it a crime to "willfully resist[], delay[], or obstruct[] any . . . peace officer." Section 148(a) does not make it a crime, however, to resist unlawful orders. *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005) (en banc).

The test for whether force was excessive is "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 398 (1989). *Graham* sets out a non-exhaustive list of factors for evaluating reasonableness: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. *Id.* at 396. Because this inquiry is fact-sensitive, summary judgment should be granted sparingly. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

This case is not an exception. If Jim did not resist arrest—and the Sheriff's officers point to no evidence that he did—the use of pepper spray alone could constitute excessive force. *See Headwaters Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125, 1129–30 (9th Cir. 2002).

## D

We must decide whether to grant summary judgment to Captain Reynolds and Lieutenant Salazar alone. Reynolds and Salazar did not directly participate in any of the allegedly unlawful acts. The Maxwells contend that summary judgment is nonetheless inappropriate because a jury could reasonably find Reynolds and Salazar liable as the ranking officers present. We agree. A supervisor is liable under § 1983 for a subordinate's constitutional violations "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Reynolds and Salazar testified that they were mere observers who stayed at the end of the Maxwells' driveway. But based on the Maxwells' version of the facts, which we must accept as true in this appeal, we draw the inference that Reynolds and Salazar tacitly endorsed the other Sheriff's officers' actions by failing to intervene. It is undisputed that Reynolds and Salazar were aware of the Maxwells' detention and witnessed at least part of Jim's arrest and beating. Reynolds testified that he heard Kneeshaw yelling "stop, stop, stop" right before the latter pepper-sprayed and struck Jim. Salazar testified that he heard a "commotion" at that time. On this appeal we do not weigh the evidence to determine whether Reynolds and Salazar's stated reasons for not intervening are plausible. *Mattos*, 661 F.3d at 439 n.2.

**IV**

We next consider whether the Viejas defendants are immune from suit because of tribal sovereign immunity. "Tribal sovereign immunity protects Indian tribes from suit absent express authorization by Congress or clear waiver by the tribe." *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 725 (9th Cir. 2008). It also protects tribal employees in certain circumstances. *See id.* at 727.

**A**

The Maxwells argue first that the Viejas defendants lack tribal sovereign immunity because the Viejas Band waived it. The Maxwells rely on California Health and Safety Code § 13863(b), which provides:

> A [fire protection] district may . . . enter into mutual aid agreements with [a] federally recognized Indian tribe that maintains a full-time fire department. The . . . federally recognized Indian tribe, or any of its employees, shall have the same immunity from liability for civil damages on account of personal injury to or death of any person . . . resulting from acts or omissions of its fire department personnel in the performance of the provisions of the mutual aid agreement as is provided by law for the district and its employees, except when the act or omission occurs on property under the control of the . . . federally recognized Indian tribe.

The Maxwells attached to their complaint documents showing the Viejas Fire paramedics came to the Maxwells' house pursuant to an agreement between the Viejas Band and the Alpine Fire Protection District. They argue these agreements should be construed as mutual aid agreements authorized by § 13863(b). They further argue that by entering into mutual aid agreements, the Viejas Band agreed that its fire department and fire department employees would have "have the same immunity" as their California counterparts for acts performed in California. Cal. Health & Safety Code § 13863(b). California firefighters are not immune for gross negligence. Cal. Health & Safety Code §§ 1799.106, 1799.107. Thus, the Maxwells conclude, the Viejas Band waived sovereign immunity for the Viejas defendants to the extent the Maxwells have alleged gross negligence.

We reject the argument. Waivers of tribal sovereign immunity must be explicit and unequivocal. *See Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1091 (9th Cir. 2007). Each agreement identified by the Maxwells explicitly retains the Viejas Band's sovereign immunity.[2]

The Maxwells cite no authority for ignoring the clear content of these agreements in favor of state statutory language to which the Viejas Band never agreed. In each case they cite, the Indian tribe explicitly subjected itself to the authority of another sovereign's courts. *See, e.g.*, *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of*

---

[2] We do not address the Viejas defendants' argument that each agreement predating December 2006 cannot be construed as falling under § 13863(b). We need not determine how California or tribal law defines these agreements because they do not satisfy the federal standard for waivers of tribal sovereign immunity.

*Okla.*, 532 U.S. 411, 422 (2001); *Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974, 981 (9th Cir. 2006). We will not infer that the Viejas Band intended the exact opposite of what it said simply because it acted in the shadow of another sovereign's law.

**B**

In addition to their waiver argument, the Maxwells claim that the Viejas Fire paramedics lack tribal sovereign immunity because (1) they have been sued as individuals (2) for acts that did not involve a policy or discretionary function. We agree with the Maxwells' conclusion but for a different reason. We conclude that the Viejas Fire paramedics do not enjoy tribal sovereign immunity because a remedy would operate against them, not the tribe. *See Shermoen v. United States*, 982 F.2d 1312, 1320 (9th Cir. 1992).

Tribal sovereign immunity derives from the same common law immunity principles that shape state and federal sovereign immunity. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *Cook*, 548 F.3d at 727. Normally, a suit like this one—brought against individual officers in their individual capacities—does not implicate sovereign immunity. *See Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1190 (9th Cir. 2003). The plaintiff seeks money damages "not from the state treasury but from the officer[s] personally." *Alden v. Maine*, 527 U.S. 706, 757 (1999). Due to "the essential nature and effect" of the relief sought, the sovereign is not "the real, substantial party in interest." *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 464 (1945).

Our remedy-focused analysis is less categorical than the Maxwells' proposed rule. While individual capacity suits

against low-ranking officers typically will not operate against the sovereign, we cannot say this will always be the case. In any suit against tribal officers, we must be sensitive to whether "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the [sovereign] from acting, or to compel it to act." *Shermoen*, 982 F.2d at 1320 (internal citations and quotation marks omitted).

The Viejas defendants point to language in many of our cases stating that "[t]ribal sovereign immunity 'extends to tribal officials when acting in their official capacity and within the scope of their authority.'" *Cook*, 548 F.3d at 727 (quoting *Linneen*, 276 F.3d at 492). Facially, this language suggests the Viejas Fire paramedics enjoy tribal sovereign immunity. *Cook*, for example, held low-ranking tribal employees were immune from claims that they performed their tribal duties in a grossly negligent way.[3] *Id.*

*Cook*, however, is consistent with the remedy-focused analysis discussed above. In *Cook*, the plaintiff had sued the individual defendants in their official capacities in order to establish vicarious liability for the tribe. 548 F.3d at 727. Thus, when *Cook* invoked the "scope of authority" principle, it was because the tribe was the "real, substantial party in interest." *Id.* The plaintiff could not "circumvent tribal

---

[3] We reject the Maxwells' argument that the Viejas Fire paramedics acted outside their authority by taking part in the unconstitutional interference with Kristin's medical care. *See Evans v. McKay*, 869 F.2d 1341, 1348 n.9 (9th Cir. 1989). The Maxwells waived that argument by suing the paramedics for state law torts only. We have reviewed the Maxwells' complaint and find no allegations supporting § 1983 liability for the paramedics.

immunity through 'a mere pleading device.'" *Id.* (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989)). In short, *Cook* conflated the "scope of authority" and "remedy sought" principles because they are coextensive in official capacity suits.

This does not change the rule that individual capacity suits related to an officer's official duties are generally permissible. As the Tenth Circuit has explained: "The general bar against official-capacity claims . . . does not mean that tribal officials are immunized from individual-capacity suits *arising out of* actions they took in their official capacities . . . ." *Native Am. Distrib. Co. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1296 (10th Cir. 2008) (emphasis in original). "Rather, it means that tribal officials are immunized from suits brought against them *because of* their official capacities—that is, because the powers they possess in those capacities enable them to grant the plaintiffs relief on behalf of the tribe." *Id.* (emphasis in original).

Several of our cases have referred to the "scope of authority" principle in individual capacity suits against tribal officers. But in that context, the "scope of authority" language refers to the principle that allegations of acts outside an officer's authority are by definition individual capacity claims. *See Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization*, 757 F.2d 1047, 1051 (9th Cir. 1985) (overruled on other grounds by *Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9 (1985)). This does not mean that the "scope of authority" and "remedy sought" principles are coextensive in individual capacity claims. Such a conclusion would be a major departure from the common law immunity doctrine that shapes tribal sovereign immunity.

The Viejas defendants' reliance on *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476 (1985), is misplaced. In *Hardin*, a tribal council ordered tribal police to eject the plaintiff from tribal land. *Id.* at 478. The plaintiff sued the tribe, several tribal institutions, and various officials in their individual capacities for declaratory and injunctive relief and damages. *Id.* We concluded the alleged actions were within the scope of the tribe's powers and that the tribe and its institutions were thus covered by sovereign immunity. *Id.* at 478–79. We then affirmed dismissal of the claims against the tribal officials, noting simply that they had "act[ed] in their representative capacity and within the scope of their authority." *Id.* at 479.

*Hardin* did not mention the "remedy sought" principle when it granted sovereign immunity, but it did not need to do so. *Hardin* was in reality an official capacity suit. *Hardin* did not (1) identify which officials were sued in their individual capacities or (2) the exact nature of the claims against them. But the use of the word "officials" suggests the plaintiff had sued high-ranking tribal council members for voting to eject him. Holding the defendants liable for their legislative functions would therefore have attacked "the very core of tribal sovereignty." *Baugus v. Brunson*, 890 F. Supp. 908, 911 (E.D. Cal. 1995).

*Evans v. McKay*, 869 F.2d 1341 (9th Cir. 1989), also does not affect our analysis. *Evans* denied sovereign immunity to individual tribal defendants sued under § 1983 and alleged to have acted in concert with state officers accused of constitutional violations. *Id.* at 1348. In a footnote, *Evans* suggested that *Hardin* displaced the "remedy sought" principle by citing its "scope of authority" language. *Id.* at 1348 n.9. If *Evans* took the broadest possible reading of

*Hardin*, it was mistaken for the reasons discussed above. That reading would also be dicta. The same footnote acknowledged that suits over plainly unlawful acts are individual capacity suits by definition and could have rested on that ground. *See id.*

In short, our tribal sovereign immunity cases do not question the general rule that individual officers are liable when sued in their individual capacities. We see no reason to give tribal officers broader sovereign immunity protections than state or federal officers given that tribal sovereign immunity is coextensive with other common law immunity principles. *See Santa Clara Pueblo*, 436 U.S. at 58. We therefore hold that sovereign immunity does not bar the suit against the Viejas Fire paramedics as individuals. The Viejas Band is not the real party in interest. The Maxwells have sued the Viejas Fire paramedics in their individual capacities for money damages. Any damages will come from their own pockets, not the tribal treasury. *See Alden*, 527 U.S. at 757.

At oral argument, the Viejas defendants gave two reasons why the Viejas Band could be the real party in interest in this suit. First, they suggested that the Viejas Band might have indemnified the paramedics and would thus have to pay for any liability. But even if an indemnification agreement exists, it would be "a purely intramural arrangement" between a sovereign and its officers. *Demery v. Kupperman*, 735 F.2d 1139, 1148 (9th Cir. 1984) (internal quotation marks omitted). The unilateral decision to insure a government officer against liability does not make the officer immune from that liability. *See id.* Second, they suggested that liability would impact the Viejas Band's ability to hire paramedics. But this case concerns allegedly grossly negligent acts committed outside tribal land pursuant to an

agreement with a non-tribal entity. In this context, denying tribal sovereign immunity to individual employees sued as individuals will have a minimal effect, if any, on the tribe's hiring ability.

## V

We therefore affirm the district court's denial of summary judgment on the ground of qualified immunity to the Sheriff's officers with regards to the Maxwells' Fourteenth Amendment due process claim and Fourth Amendment search and seizure claims, reverse the district court's granting of the Viejas defendants' motion to dismiss for lack of subject matter jurisdiction due to tribal sovereign immunity, and remand for further proceedings. Costs are awarded to plaintiffs-appellants.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

IKUTA, Circuit Judge, dissenting:

The facts of this case are undeniably tragic. But despite the ill-fated sequence of events, the Sheriff's deputies who secured the crime scene did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), by delaying the ambulance's departure for a few minutes, if at all, or detaining the Maxwells while they obtained and executed a search warrant for the Maxwells' home. Accordingly, qualified immunity protects all the deputies from suit for civil damages. *See id.*

In reaching the opposite conclusion, the majority draws strained analogies to cases whose facts are not "even roughly comparable to those present in this case," *Ryburn v. Huff*, 132 S. Ct. 987, 990 (2012), and fails to heed the Supreme Court's instruction "not to define clearly established law at a high level of generality," *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2084 (2011). I therefore join Part IV of the majority opinion but dissent with respect to Part III.

## I

In holding that the Sheriff's deputies were not entitled to qualified immunity for allegedly violating Kristin's due process right to bodily security, the majority misconstrues both the chronology of events and the applicable case law.

## A

Kristin was shot inside her house shortly before 10:50 PM on December 14, 2006. At that time, Kristin was able to call 911, to move about the house, to sit upright, and to communicate effectively. At 10:53 PM, Deputy Sheriff Jackson first arrived on the scene. At 10:58 PM, a nurse who lived nearby arrived and found that Kristin was alert, oriented, and able to answer questions appropriately.

At around 11:00 PM, the first ambulance and paramedics arrived. At 11:03, the paramedics determined that Kristin's vital signs were within normal limits. Rather than transport Kristin to the hospital immediately, the paramedics decided to call an air ambulance, which would arrive in twenty-five minutes at a landing site ten minutes from the Maxwells' residence.

At 11:08, the second ambulance arrived. At 11:11 PM, paramedics again determined that Kristin's vital signs were within normal limits.

At 11:16, Sergeant Michael Knobbe arrived and began the process of securing the crime scene. As part of that process, two Sheriff's deputies took Jim and Kay Maxwell, Kay's father Fred Stevens, and Kristin's two children out of the house, and left Kay, Fred and the children in the family motor home in the Maxwells' driveway. Jim was told to remain in the driveway outside the motor home. According to Jim Maxwell, while he was on his way to the family's motor home he heard a deputy declare, "Nobody is leaving. This is a crime scene." This statement, and a statement subsequently made by Jackson during a deposition that Knobbe was "so concerned with the crime scene [he] didn't want to let the ambulance leave," is the only evidence the Maxwells offer to support their claim that the deputies caused a delay.

It was not until the paramedics first placed Kristin on a gurney in the back of the Viejas Fire ambulance between 11:18 PM and 11:25 PM that she began exhibiting signs of distress, expelling blood from her mouth. Knobbe testified that he saw paramedics take Kristin back out of the ambulance and place her in a sitting position at some time between 11:23 PM and 11:26 PM.

The ambulance departed at around 11:30 PM and arrived at the landing site at 11:41, approximately eleven minutes after the air ambulance had arrived. Kristin was pronounced dead at 11:42 PM.

Construing these facts in the light most favorable to the Maxwells, as we must on summary judgment, *see, e.g.,*

*Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009), two things are clear.  First, there is no evidence that the Sheriff's deputies were aware of the urgency of Kristin's situation when they allegedly delayed the ambulance.  After Kristin was shot, she was conscious, communicating effectively, and her vital signs were normal.  The County Medical Examiner testified that Kristin's injury was "survivable and reparable."  The deputies knew that the paramedics who were tending to her decided to wait the 25 minutes it would take for an air ambulance to arrive.  Based on multiple contemporaneous assessments of Kristin's condition in the aftermath of the shooting, the Sheriff's deputies could reasonably conclude that her condition was stable and that a delay of a few minutes would not put her in peril.

Second, any delay caused by the deputies could not have lasted longer than seven minutes.  The Maxwells' evidence shows that the ambulance was not even ready to depart until 11:23 PM at the earliest, when Kristin was placed inside the ambulance a second time.  The ambulance left at 11:30 PM, at most seven minutes later.

## B

Under these facts, the deputies are entitled to qualified immunity.  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  A government official's conduct does not violate clearly established law unless, at the time of the challenged conduct, the contours of a right were "sufficiently clear 'that *every* reasonable official would have

understood that what he is doing violates that right.'" *Id.* (emphasis added) (alterations omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The right at issue here was Kristin's due process right to bodily security. The majority claims that the deputies should have understood they were violating this right because they delayed the ambulance from leaving, thus putting her in danger. Maj. op. at 13. But under our case law, government officials cannot be held liable for affirmatively placing the plaintiff in a position of danger unless they acted with "deliberate indifference to [a] known or obvious danger." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)). This means that the plaintiffs must present evidence that the government officials "recognize[d] the unreasonable risk and actually intend[ed] to expose the [victim] to such risks without regard to the consequences to the [victim]." *Grubbs*, 92 F.3d at 899 (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 n.8 (10th Cir. 1995)).

There is no such evidence here. And there is no basis for the majority's conclusion otherwise. The only case from this circuit holding state deputies liable for preventing a person from receiving emergency medical care is not remotely close to this case. *See Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997). In *Penilla*, the Ninth Circuit held police officers liable for a due process violation where, after finding a man "in grave need of medical care," they inexplicably cancelled a 911 call to paramedics, dragged the man from his porch into his empty house, locked the door, and left him there alone, where he died. *Penilla*, 115 F.3d at 708. The court found that the officers "took affirmative actions that significantly increased the risk facing Penilla" by

"ma[king] it impossible for anyone to provide emergency medical care to [him]." *Id.*

In *Penilla*, it should have been clear to any reasonable officer that the victim would die without immediate medical assistance. But there was no such evidence in this case. On the contrary, Kristin's vital signs were within normal limits and her condition appeared to be stable until shortly before her death. Instead of putting the victim beyond the reach of any help, as in *Penilla*, the deputies at most delayed the ambulance's departure for a few minutes once paramedics had already begun administering medical care. Finally, even if the (at most) seven-minute delay before the ambulance left the property could have placed Kristin in danger, there is no evidence that the deputies actually recognized that risk.

This case is far more similar to *Estate of Amos ex rel. Amos v. City of Page, Arizona*, 257 F.3d 1086 (9th Cir. 2001), where we held that deputies were not liable even though they interfered with third party rescue efforts. *Id.* at 1089. In *Estate of Amos*, the police prevented civilian efforts to search for the victim of a car accident, who had wandered off into the desert. The police called off their own search efforts later that night when their flashlights lost power. *Id.* Months later, the victim was discovered dead at the bottom of a canyon. *Id.* We rejected the plaintiff's argument that the officers were liable because "they greatly increased [the victim's] risk of danger when they called off civilian search efforts at the accident site and did not provide adequate replacement protection." *Id.* at 1091. Although the plaintiffs described "a bungled and ineffectual police search," we held that the facts did not demonstrate that the police officers "were aware of a known and significant risk of death 'yet consciously chose a course of action that ignored the risk.'" *Id.* at 1092 (quoting

*Ross v. United States*, 910 F.2d 1422, 1433 (7th Cir. 1990)). As in *Estate of Amos*, the Maxwells have described the deputies' emergency response as "bungled and ineffectual," but they have not established deliberate indifference. *Id.*

Instead of citing relevant case law, the majority makes the unsupported and conclusory statement that "it was obvious" that the deputies violated Kristin's due process right to bodily security. Maj. op. at 16. But only in retrospect is it "obvious" that the brief delay may have raised the risk that Kristin would die from her injuries. This very term, the Supreme Court reprimanded the Ninth Circuit for judging the reasonableness of officers' conduct "with the 20/20 vision of hindsight" rather than "from the perspective of a reasonable officer on the scene." *Ryburn*, 132 S. Ct. at 992 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The Court reaffirmed that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* (quoting *Graham*, 490 U.S. at 396–97). Contrary to the Court's direction, the majority's eyes here are focused on the rearview mirror. Given that Kristin's medical condition initially appeared stable and that paramedics were actively tending to her at the time of the alleged delay, the danger was not so obvious that a decision to briefly delay the ambulance shows deliberate indifference.

## II

The majority likewise errs in holding that the Sheriff's deputies were not entitled to qualified immunity with respect to the Maxwells' claim that they were unreasonably seized in violation of the Fourth Amendment, and that one of the

deputies, Sergeant Kneeshaw, used excessive force against Jim Maxwell when he attempted to see his wife. As before, the majority's conclusion is based on a misconstruction of both the facts and the law.

## A

After Knobbe began the process of securing the crime scene, Kay and Fred Maxwell and the two children were told to remain in the family's motor home. The motor home was equipped with a bathroom, running water, electricity, heat, a bed, and a TV. Kay testified that although she could not get the heat to work at first, a deputy was "nice enough to crawl underneath" the motor home to turn the propane on. Kay put the children in bed and turned on the TV. Kay's father eventually fell asleep in a chair.

Jim Maxwell remained outside the motor home; the deputies wanted to restrict Jim and Kay (the two witnesses of the crime) from communicating with each other before they were interviewed so that the deputies could "obtain untainted information related to the homicide." The deputies also told Jim and Kay that they could not follow their daughter in the ambulance.

According to the undisputed facts, at some time after 1:00 AM, Kneeshaw told Jim Maxwell that Kristin had died. Although Jim wanted to tell his wife, Kneeshaw told him he had to stay in the driveway. Jim stated, "You will have to shoot me, I am going to see my wife," and continued walking to the motor home. Kneeshaw stepped in front of Jim and again told him to stop, but Jim attempted to continue walking. At that point, Kneeshaw sprayed Jim with pepper spray and struck him on the leg with his baton. Kneeshaw and Knobbe

then handcuffed Jim's hands behind his back. They removed the handcuffs shortly thereafter. Jim testified that a deputy then asked him whether he was okay and allowed him to rinse his eyes out at the faucet at the end of the street. Jim also testified that the pepper spray did not cause him any pain or discomfort, and that it was not the pepper spray or baton that made him stop, but only the two deputies who handcuffed him. He apologized to the deputies after the altercation.

Around two hours later, at 3:35 AM, a homicide detective obtained a search warrant for the Maxwells' home; the search began at roughly 3:50 AM. Meanwhile, two detectives began interviewing Jim Maxwell regarding the murder investigation at 3:26 AM. The detectives interviewed Kay Maxwell beginning at 4:50 AM, and they finished questioning her at 5:55 AM. The search of the house was ongoing during these interviews.

The Maxwells claim they were unlawfully detained, in violation of their Fourth Amendment rights, for over six hours, from 11:16 PM until the detectives finished interviewing Kay at 5:55 AM. The detectives testified (and the Maxwells did not dispute) that they did not order Jim Maxwell or Kay Maxwell to submit to being interviewed against their will. Neither Jim nor Kay asked to leave during their interviews, and both were cooperative. Sergeant Edward Musgrove testified that Jim and Kay Maxwell were interviewed "at the same time the residence was being searched" in order to "reduce[] the time that the witnesses were excluded from the residence, and restricted from communicating with each other."

**B**

No Supreme Court or Ninth Circuit decision establishes that the deputies' conduct in detaining, separating, and questioning the Maxwells while they obtained and executed a search warrant for the Maxwells' home was unreasonable. Rather, all the precedents point in the other direction.

First, it is well established that a search warrant "carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005). Indeed, "[a]n officer's authority to detain incident to a search is *categorical*; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Mena*, 544 U.S. at 98 (emphasis added) (quoting *Summers*, 452 U.S. at 705 n.19). It is irrelevant whether the detained individual is suspected of criminal activity because "'[t]he connection of an occupant to [a] home' alone 'justifies a detention of that occupant.'" *Id.* at 99 n.2 (quoting *Summers*, 452 U.S. at 703–04). Therefore, the deputies' authority to detain the Maxwells during the roughly two and a half hours *after* the search warrant issued did not violate their Fourth Amendment rights.

In fact, aggressive and prolonged detentions of the residents of a house can be justified in connection with executing a search warrant, even when the search does not occur in the immediate aftermath of a violent crime. Thus, in *Mena*, the Court held that it was "plainly permissible" for officers executing a search warrant, which was based on probable cause to believe that a gang member lived in the target house, to enter the bedroom of a woman not suspected

of gang activity while she was asleep in bed, place her in handcuffs at gunpoint, and detain her (along with three other individuals) in the garage for two to three hours while the search proceeded. *Id.* at 95–96, 98. Putting a non-suspect in handcuffs for two to three hours was not an unreasonable seizure because "[i]nherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* at 98–99. Similarly, in *Dawson v. City of Seattle*, 435 F.3d 1054 (9th Cir. 2006), we held that officers could reasonably detain boardinghouse residents for two hours while executing inspection warrants for evidence of rodent infestation, even though the officers drew their weapons and screamed at the residents, forced one resident outside without her shoes; refused to allow the detainees to drink coffee, smoke cigarettes, or go to the bathroom without an escort; and questioned the detainees about whether they had drugs or weapons in their rooms. *Id.* at 1058–60. We emphasized that, if not detained, the residents "might have fled, rendering themselves unavailable to answer questions pertinent to the search," or mistakenly "impaired the search rather than assisted it." *Id.* at 1066–67. The officers' interrogation of the detainees did not alter the Fourth Amendment analysis because there was no evidence that the questioning prolonged the detention or that "the police conditioned Plaintiffs' release from detention on Plaintiffs' willingness to submit to an interrogation." *Id.* at 1068–69.

Second, both Supreme Court and Ninth Circuit cases support the deputies' decision to detain the Maxwells while seeking a search warrant based on probable cause to believe that a violent crime had just occurred inside the Maxwells' house. The Supreme Court has made clear that a search warrant is not always necessary to justify detention of the

occupants of a targeted home. Thus, in upholding the detention of an individual while officers executed a search warrant for his home, *Summers* noted that the holding did not "preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant." *Summers*, 452 U.S. at 703 n.17. As suggested by *Summers*, the Court later held that exigent circumstances justified officers in detaining a man outside his home for roughly two hours while they obtained a search warrant for the home. *See Illinois v. McArthur*, 531 U.S. 326, 328 (2001). *McArthur* explained that four factors made the warrantless detention reasonable: (1) the officers "had probable cause to believe that . . . [the] home contained evidence of a crime and contraband," (2) the officers "had good reason to fear that, unless restrained, [the defendant] would destroy evidence before they could return with a warrant," (3) the officers "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy" by not searching the home or arresting the resident before obtaining the warrant, and (4) the detention was "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id.* at 331–33.

These cases fully support the conclusion that the exigencies present in this case made it reasonable for the deputies to detain the Maxwells while seeking a search warrant. The deputies arrived minutes after a violent crime had occurred, and it was their responsibility to assist the victim and secure the crime scene. They realized that the Maxwells' home contained evidence necessary to prosecute the perpetrator. *See McArthur*, 531 U.S. at 332. They also had good reason to believe that allowing the Maxwells back in the house could compromise the evidence. *See Dawson*, 435 F.3d at 1067; *see also McArthur*, 531 U.S. at 326, 332.

For example, Jim Maxwell admitted that in the immediate aftermath of the shooting, he picked up the gun Bruce used to shoot Kristin in a misguided attempt to assist the deputies by bringing the weapon to them. Finally, they needed to get the statements of witnesses, and they reasonably believed that if they did not separate Jim and Kay, the two of them might influence one another's recollections, making their statements vulnerable to challenge in court and jeopardizing the prosecution.

Moreover, the deputies detained the Maxwells in a reasonable manner. In fact, the Maxwells were treated far more humanely than were the detainees in *Mena* or *Dawson*, who also were not suspected of any crime. The deputies allowed Kay, her father, and the children to wait in the privacy of their family motor home for the duration of the pre-warrant period. Deputy Kneeshaw's brief use of force against Jim, which Jim himself testified did not cause him any memorable pain or discomfort, was fully justified in order "to effectuate the detention." *Mena*, 544 U.S. at 99. And the four-hour period was no longer than reasonably necessary for the police to obtain the warrant. All the evidence in the record indicates that the deputies acted diligently in obtaining the warrant as quickly as possible at a time "when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests." *Segura v. United States*, 468 U.S. 796, 812–13 (1984) (holding that a 19-hour warrantless seizure of a building, half of which occurred during the period between 10:00 PM and 10:00 AM the following day, was reasonable under the circumstances). Based on these factors, the deputies' decision, "even if constitutionally deficient, reasonably misapprehend[ed] the law governing the

circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The majority's reliance on *United States v. Ward*, 488 F.2d 162 (9th Cir. 1973) (en banc), and *Illinois v. Lidster*, 540 U.S. 419 (2004), is puzzling, because these cases are far afield from the issues before us. Both decisions consider when the Fourth Amendment allows police to stop cars on the road in order to investigate crimes committed by third parties. In *Lidster*, the Court held that the Fourth Amendment allowed police to stop motorists at a highway checkpoint to ask them whether they had any information about a recent hit-and-run accident. *Lidster*, 540 U.S. at 426–28. In *Ward*, we held that FBI agents violated a driver's right to travel the public roads when they pulled him over to interview him regarding a months-old investigation of a third-party fugitive. *Ward*, 488 F.2d at 169. Unlike *Mena* and *Dawson*, these cases provide no guidance as to when a police officer acts reasonably in securing a crime scene and detaining occupants and witnesses. "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,'" the Court has explained, "its proper application requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396 (internal quotation marks omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). For instance, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Al-Kidd*, 131 S. Ct. 2084; *see also Brosseau*, 543 U.S. at 198 (emphasizing that the assessment of clearly established law in the Fourth Amendment context "must be undertaken in light of the specific context of the case, not as a broad general proposition") (quoting *Saucier v. Katz*,

533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).  Because the facts and circumstances of *Lidster* and *Ward* shed no light on whether the detention and separation of building occupants in the immediate aftermath of a shooting is reasonable, these cases do not support the majority's determination that there was clearly established law prohibiting the deputies' conduct.

**III**

Finally, even if the majority were correct that the deputies violated clearly established law, it is impossible to conclude that Captain Gregory Reynolds and Lieutenant Anthony Salazar could be held liable merely because they were standing behind yellow crime tape at the scene.

We have long held that officers may not be held liable "*merely* for being present at the scene of an alleged unlawful act" or for being a member of the same team as the wrongdoers. *Jones v. Williams*, 297 F.3d 930, 936–38 (9th Cir. 2002) (emphasis added).  More recently, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), clarified that there is no respondeat superior liability under § 1983.  Rather, a government official may be held liable only for the official's own conduct. *Id.* at 675–76.  To bring a § 1983 action against a supervisor, the plaintiff must show: (1) the supervisor breached a legal duty to the plaintiff, *see Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011); (2) the breach of duty was "the proximate cause" of the plaintiff's constitutional injury, *id.* at 1207, and (3) the supervisor had at least the same level of *mens rea* in carrying out his superintendent responsibilities as would be required for a direct violation of the plaintiff's constitutional rights, *Iqbal*, 129 S. Ct. at 1949; *see also Starr*, 652 F.3d at 1207.

Here the Maxwells do not allege that Reynolds and Salazar took any affirmative acts to set in motion the allegedly unconstitutional acts of their subordinates, nor do they present any evidence that Reynolds and Salazar knew about their subordinates' conduct in delaying the ambulance or detaining and separating the Maxwells. Moreover, they do not dispute that neither Reynolds nor Salazar crossed the yellow tape across the Maxwells' driveway that restricted entry to the crime scene. The Maxwells allege merely that Reynolds and Salazar (1) were the highest ranking officials at the scene, (2) could observe the crime scene from the driveway, and (3) heard Kneeshaw yelling at Jim Maxwell to "stop, stop" just before using pepper spray and striking Jim with his baton.

These allegations are insufficient to create a genuine issue of material fact that Reynolds and Salazar breached a legal duty to the Maxwells, that they were the proximate cause of the Maxwells' constitutional injuries, or that they acted with the requisite state of mind. First, the Maxwells do not allege that the supervisors were even aware that the deputies delayed Kristin's departure, let alone that the supervisors acted with deliberate indifference. Nor can we infer, solely based on geographic proximity, that Reynolds and Salazar knew or reasonably should have known that the other Sheriff's deputies had forcibly detained the Maxwells and prevented them from seeing their daughter and each other, and that there were no exigent circumstances to justify the detention. This is especially true given that Reynolds and Salazar never entered the crime scene. Nor is there any evidence "of a *specific* policy implemented by the Defendants or a *specific* event or events instigated by the Defendants that led to these purportedly unconstitutional" seizures. *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012). As in *Hydrick*,

"the factual allegations in Plaintiffs' complaint resemble the 'bald' and 'conclusory' allegations in *Iqbal*, instead of the detailed factual allegations in *Starr*." *Id.* at 941. It is therefore clear that Reynolds and Salazar cannot be held liable for the alleged constitutional violations of other deputies on the scene.

## IV

It is a truism that "tragic facts make bad law." *Wyeth v. Levine*, 555 U.S. 555, 604 (2009) (Alito, J., dissenting). Nevertheless, we may not furnish a cause of action where the law does not supply one. *See Whitmore v. Arkansas*, 495 U.S. 149, 166 (1990); *see also Gusman v. Marrero*, 180 U.S. 81, 87 (1901). The deputies arriving at the Maxwells' residence faced a chaotic scene: a woman had been shot in the jaw; the perpetrator was still in the house; multiple ambulances and paramedics were responding to the scene; and frantic relatives were milling about. From the perspective of the deputies, it was more than merely reasonable to take steps to secure the crime scene and separate the witnesses—it was their duty. The majority has not pointed to a single case that clearly establishes that the deputies' actions here violated the Maxwells' constitutional rights. Under existing case law, the deputies are entitled to qualified immunity for their actions. I therefore respectfully dissent.